STATE OF NEBRASKA, APPELLEE, V. BRUCE W. ROGGENKAMP,
APPELLANT.
402 N.W.2d 682

Filed March 13, 1987.    No. 86-648.

John D. Rouse and Jerry Soucie, for appellant.

Robert M. Spire, Attorney General, and Elaine A. Catlin, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

SHANAHAN, J.

In a bench trial in the county court for Lancaster County Bruce W. Roggenkamp was convicted of drunk driving, that is, operating a motor vehicle while under the influence of alcoholic

liquor or while Roggenkamp had ten-hundredths of 1 percent by weight of alcohol in his body fluid, a violation of Neb. Rev. Stat. § 39-669.07 (Reissue 1984). Roggenkamp appealed to the district court for Lancaster County, which affirmed the judgment of the county court. We affirm.

At 1:45 a.m. on March 24, 1985, Deputy Gordon Harrod of the Lancaster County Sheriff's Department was northbound in his cruiser on Southwest 84th Street near Lincoln. Deputy Harrod observed a southbound vehicle approaching at a speed of 30 miles per hour on Southwest 84th Street, a two-lane public highway with a blacktop surface and a 55-m.p.h. speed limit. A yellow centerline divided the driving lanes of the highway, and white lines marked the edges of the surface.

After the oncoming car had passed the cruiser, Deputy Harrod observed the southbound vehicle in the cruiser's rearview mirror. Deputy Harrod saw the other vehicle move to the shoulder on the west side of the road, then "cross into the center" of the highway, and again move back toward the west edge of the road. Harrod turned his cruiser around, followed the southbound vehicle, a Chevrolet Vega, for some distance, and saw that automobile straddle the centerline on the road. Harrod also observed the other car "drop off — completely off the roadway with about half [the] vehicle on the right shoulder — the right side of [the] vehicle on the southbound lane on the shoulder and pull back out of the shoulder and cross the center lane with about half of [the] vehicle also southbound." Approximately 200 yards north of the private driveway from the highway to the Roggenkamp residence, Deputy Harrod activated the cruiser's revolving red lights. When the Vega turned into the driveway, Harrod followed as the driveway led to the Roggenkamp house.

The Vega stopped about 20 feet from the house. After Deputy Harrod stopped his cruiser behind the Vega and was getting out of the cruiser, the male driver of the Vega got out of his car. When Harrod walked up to the driver, later identified as Bruce Roggenkamp, Harrod told Roggenkamp about the deputy's observations of Roggenkamp's erratic driving. At that point Harrod detected the "odor of alcohol" from Roggenkamp. Through illumination from the deputy's

flashlight, Harrod saw Roggenkamp's bloodshot eyes. Roggenkamp is 6 feet tall and weighs 220 pounds. Deputy Harrod requested inspection of the driver's license of Roggenkamp and his vehicle registration. Roggenkamp responded: "I'm not interested. Good night." When Roggenkamp started to leave and walk toward his house, Deputy Harrod told Roggenkamp he would be arrested if he tried to leave. Roggenkamp's reply was "Now, good night. I'll see you some other time." Throughout this time Bruce Roggenkamp's wife, Cynthia, who is 5 feet 7 inches tall and weighs 230 pounds, was standing nearby, at the front of the Roggenkamp car.

As Bruce Roggenkamp was walking toward his house, Harrod stepped between Roggenkamp and the house, informing Roggenkamp that he was being placed under arrest. In Deputy Harrod's description of ensuing events, Cynthia Roggenkamp "came at me at a fairly high rate of speed," grabbed the officer, and "pulled, pushed, knocked me down to my knees when I was trying to keep Mr. Roggenkamp from leaving." Harrod "advised [Cynthia Roggenkamp] that she would have to leave me alone or I would place her under arrest." In the course of his contact with Cynthia Roggenkamp, Harrod detected the "odor of alcohol" on her breath but did not observe anything about her eyes. Bruce Roggenkamp, who had walked up some stairs to the front door of his house, returned to the bottom of the steps and joined the struggle between Cynthia Roggenkamp and Deputy Harrod. According to Harrod,

> At that time [Cynthia Roggenkamp] got back up. She was struggling with me. And shortly after she rejoined I believe [Bruce Roggenkamp] disengaged and went back upstairs. While he attempted to disengage, I was able to get away from her and shortly after that is when I tried to handcuff him initially.

Harrod arrested Bruce Roggenkamp and, during a momentary lull in the action, "got on my radio — my portable radio and advised [the sheriff's dispatcher] that I needed assistance. . . . [T]hey [Roggenkamps] weren't gonna quit. . . . I was fighting with a couple of real large people."

Roggenkamps ran up the stairs and into their house. Harrod pursued and placed his foot in the doorway, when Roggenkamps slammed the door, trapping Harrod's foot. "They smashed my foot," Harrod testified, causing "a great deal of pain." In an attempt to extricate his foot, Harrod thrust his PR 24, an aluminum nightstick, into the opening of the door. While Harrod was using his nightstick to pry open the door, he could hear "grunting" on the other side of the door as Roggenkamps pushed against that door. Harrod "could tell that they were right there so I just tried to keep my stick in the door." At this time someone, just inside the door, was "stomping" on Harrod's foot. Also, someone inside pulled on Harrod's nightstick,

> trying to scramble to get the — the stick. So while I was trying to pull on the stick and the door was — the pressure on the door was released, I was able to pull my foot back out. And then as I was pulling on the stick they reversed their efforts and pushed the stick, which resulted in the door being closed.

Through a window in the door, Deputy Harrod saw Bruce Roggenkamp depart from the door area and walk down a hallway in the house. Believing that Bruce Roggenkamp might "drink some alcohol that would adversely affect . . . an intoxilyzer" or that Roggenkamp might "get something like a shotgun and blow me off the porch," Deputy Harrod threw his weight against the door, breaking the doorjamb and gaining entry.

Later, an Intoxilyzer test was administered to Bruce Roggenkamp and produced a "digital reading" of ".163% w/v." Pursuant to Neb. Rev. Stat. § 29-824 (Reissue 1985), Bruce Roggenkamp filed a motion to suppress the results of the Intoxilyzer test. That motion was denied by the county court on July 18, 1985. Roggenkamp's case was tried to the county court on October 3 in a "Trial by Stipulation." For the purpose of that trial, the deputy county attorney and Roggenkamp's lawyer stipulated in open court:

> Your Honor, this matter was set for stipulated trial at this time. The parties are in agreement that Exhibits 1 through 5 may be received by the Court. We further stipulate that

Deputy Harrod, the officer involved in the case, gave Mr. Roggenkamp an intoxilyzer test on March 24th, 1985 and that he followed the procedures that are listed in Rule — Title 177 of the Department of Health Rules and Regulations; that he followed the checklist technique using the Intoxilyzer 4011AS, Serial Number 102316. He followed the checklist technique in the sequence, which is on the sheet. He checked the maintenance performed by Pam Zilly, the maintenance officer, and verified that the maintenance, repair and calibration had been performed for that particular intoxilyzer and that everything was okay with the machine; that he performed the test; a good sample was given; there were no problems with the machine; and the result of the intoxilyzer test was .163 percent weight per volume blood alcohol content. This all occurred in Lancaster County, Nebraska; and also that he is a permit holder, having a Class B permit as required by the Rules.

Upon specific inquiry from the court, Roggenkamp's lawyer acknowledged that the stipulation covered venue, Roggenkamp's driving a motor vehicle on a "public street," and the "chemical test." Regarding the stipulation, exhibits 1 and 2 are transcriptions of testimony given at the hearing on Roggenkamp's motion to suppress, containing the description of events at the Roggenkamp residence, as previously stated in this opinion. Exhibit 5 is a written report containing the result of the test administered to Roggenkamp by an "Intoxilyzer Model 4011AS," and reflected the Intoxilyzer's digital reading of ".163% w/v" concerning the sample of Roggenkamp's breath given for such testing. Pursuant to the stipulation by counsel, the court stated: "Exhibits 1 through 5, inclusive are offered and received. Thank you." Thereafter, the court found Roggenkamp guilty of drunk driving and imposed sentence on Roggenkamp. On appeal, the district court for Lancaster County affirmed the county court's judgment.

Roggenkamp lists nine assignments of error, but those may be distilled into two. First, Roggenkamp claims there was no probable cause for Harrod's arrest of Roggenkamp. Second, Roggenkamp contends the Intoxilyzer test result was

inadmissible because such test resulted from an illegal search or seizure in violation of Roggenkamp's constitutional guarantees against such action.

Neb. Rev. Stat. § 29-404.02 (Reissue 1985) provides in part:

> A peace officer may arrest a person without a warrant if the officer has reasonable cause to believe that such person has committed:
>
> . . . .
>
> (2) A misdemeanor, and the officer has reasonable cause to believe that such person . . . (d) has committed a misdemeanor in the presence of the officer.

The lawfulness of an arrest without a warrant must be based on probable cause, which exists where "facts and circumstances within an officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a man of reasonable caution to believe that an offense has been or is being committed." *State v. Harrison*, 218 Neb. 532, 535, 357 N.W.2d 201, 204 (1984). See, also, *Ker v. California*, 374 U.S. 23, 83 S. Ct. 1623, 10 L. Ed. 2d 726 (1963). "If the facts available to the officer at the time of the arrest would warrant a man of reasonable caution in the belief the action was appropriate, then probable cause exists." *State v. Hack and Callans*, 212 Neb. 406, 408, 322 N.W.2d 806, 808 (1982). Thus, the key to a lawful arrest without a warrant is reasonable or probable cause that a person has committed a crime.

There is no doubt that Deputy Harrod had probable cause to arrest Roggenkamp for drunk driving. Deputy Harrod saw the erratic operation of Roggenkamp's automobile on a public highway. Harrod, within moments of observing Roggenkamp's display of driving, detected the odor of an alcoholic beverage, as such odor emanated from Roggenkamp, and saw Roggenkamp's bloodshot eyes. Because Deputy Harrod's attention was rather dramatically diverted from continuous observation of Bruce Roggenkamp, apparently the deputy did not notice the manner of Bruce Roggenkamp's walking. However, the Roggenkamp tag team effort is a circumstance which may be considered. Events outside the Roggenkamp house supplied an adequate basis for probable cause under the circumstances. Because Bruce Roggenkamp was arrested on

probable cause outside his home, an arrest warrant was unnecessary. See, *State v. Harrison, supra; United States v. Santana*, 427 U.S. 38, 96 S. Ct. 2406, 49 L. Ed. 2d 300 (1976). Beyond our inquiry whether there was probable cause to arrest Bruce Roggenkamp for drunk driving, we neither evaluate nor comment further on the events which occurred at the Roggenkamp residence. Roggenkamp's first assignment of error has no merit.

That brings us to Roggenkamp's second assignment of error, a question concerning admission of evidence in the form of the Intoxilyzer test result. As reflected in the briefs filed in this case, the attorneys have done considerable research regarding constitutional considerations involved in searches and seizures. However, there is another fundamental consideration. Where is Roggenkamp's objection to admission of the Intoxilyzer test result as evidence at his trial? Not only was there no objection to admitting the test result as evidence, there was a stipulation for admission of that test result.

Considering first the absence of an objection, McCormick on Evidence § 52 at 126 (E. Cleary 3d ed. 1984) expresses a reason for necessity of an objection at trial:

> If the administration of the exclusionary rules of evidence is to be fair and workable the judge must be informed promptly of contentions that evidence should be rejected, and the reasons therefor. The initiative is placed on the party, not on the judge. The general approach, accordingly, is that a failure to object to an offer of evidence at the time the offer is made, assigning the grounds, is a waiver on appeal of any ground of complaint against its admission.

As dictated by the Nebraska Evidence Rules, error may not be predicated on a ruling which admits evidence unless a substantial right of a party is affected and a timely objection appears of record, stating the specific ground of objection, if a specific ground was not apparent from the context. Neb. Evid. R. 103(1)(a) (Neb. Rev. Stat. § 27-103(1)(a) (Reissue 1985)). "If a party does not make a timely objection to evidence, the party waives the right on appeal to assert prejudicial error." *State v. Archbold*, 217 Neb. 345, 352, 350 N.W.2d 500, 505 (1984).

Today, in *State v. Pointer, ante* p. 892, 402 N.W.2d 268 (1987), we reviewed a situation involving a defendant's failure to object to evidence admitted at trial after a court had overruled the defendant's motion to suppress the same evidence. In *Pointer,* we stated at 895, 402 N.W.2d at 271: "[I]n a criminal trial, after a pretrial hearing and order which overrules a defendant's motion to suppress his statement, the defendant must object at trial to the receipt of the statement in order to preserve the question for review on appeal." The principle enunciated in *Pointer, supra*, is equally applicable to the Intoxilyzer test result in Roggenkamp's case.

If a waiver includes a voluntary relinquishment of a known right, a classic illustration of waiver is found in the present case. While Roggenkamp protests use of the Intoxilyzer test result as evidence against him, his situation is similar to that of an individual who invites another to throw a rock at him and, when struck, complains that the rock was thrown too hard. There is a legal maxim expressed in Latin—Volenti non fit injuria. Few care about Latin anymore, but the principle expressed in that language is noteworthy: One who consents cannot receive an injury. Therefore, we hold that a party who has stipulated to the admission of evidence cannot on appeal complain about evidence admitted pursuant to and in accordance with such stipulation. See *American Oil Co. v. City of Omaha*, 182 Neb. 532, 155 N.W.2d 805 (1968) (eminent domain proceedings; condemner's stipulation that condemnee had suffered a decrease in business during years pertinent to the condemnation proceedings; condemner cannot complain about stipulated evidence).

We conclude that there is no error in the judgment of the district court. Consequently, the judgment of the district court is affirmed.

AFFIRMED.