STATE OF NEBRASKA, APPELLEE, V. MARK J. SALAMON, APPELLANT.
491 N.W.2d 690

Filed November 6, 1992.   No. S-91-632.

Thomas M. Kenney, Douglas County Public Defender, and Brian S. Munnelly for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

SHANAHAN, J.

A jury in the district court for Douglas County found Mark J. Salamon guilty of robbery. Salamon was sentenced and has appealed. We affirm the judgment entered on Salamon's conviction.

## BACKGROUND OF ROBBERY AND IDENTIFICATION

Around 4 p.m. on November 15, 1990, a man called at the front door of the Omaha residence of the victim, an 83-year-old woman. After the two talked for a while, the victim opened the door and admitted the man into the house. As the man entered, he grabbed the victim's hands and tied them with strips of cloth. He began ransacking the residence, discovered some money in the victim's wallet and a coin purse, and then left. The victim was able to free herself and go to a neighbor's house, from which police were summoned. The robbery unit of the Omaha Police Division commenced an investigation and, during its investigation, received information from an anonymous source that Salamon was the robber. A police detective brought photographs of eight individuals, including a photograph of Salamon, who had a police record, to the victim at her home. The victim, when asked whether her robber's photograph was among those displayed, selected Salamon's photograph from among the eight while remarking that the man in the selected

photograph "looks like" the man who robbed her. From the photograph, however, the victim was unable to "positively" identify Salamon as the robber. As the result of further investigation, police located Salamon on December 10; proceeded to Salamon's residence; and, without an arrest warrant or Salamon's permission to enter, went into the residence, arrested Salamon, and transported him to police headquarters.

At the police station on the morning of December 11, the police conducted a lineup for the victim's possible identification of her robber. The lineup was separated from a viewing room by a one-way glass to prevent those in the lineup from seeing anyone observing from the viewing room. Before the victim entered the viewing room, she was admonished that although the lineup was used for possible identification of the robber, he might not be among the individuals in the lineup. However, as the victim entered the viewing room, she said to an officer: "I think I see him already," referring to Salamon, who was in the lineup. While Salamon was standing near the one-way glass, the victim, on closer observation of Salamon and further inquiry whether she could identify the man at the glass as her robber, said: "That looks like him. . . . I think that's him, but I can't be totally positive." When an officer asked whether the victim could be "positive" about an identification, the victim responded: "No, but it looks like him."

### SUPPRESSION HEARING

Before trial, Salamon filed two suppression motions. Salamon sought suppression of physical evidence obtained as the result of an unreasonable search and seizure, since the police entered his residence without permission and arrested him without a warrant. See, U.S. Const. amend. IV; Neb. Const. art. I, § 7. In his other motion, Salamon attempted to suppress the victim's pretrial identification of him, because the identification resulted from an impermissibly suggestive process leading to the victim's identification of him. See *Stovall v. Denno*, 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967) (confrontation for identification that is unnecessarily suggestive and conducive to irreparable mistaken identification

of a defendant may violate the defendant's right to due process). After the court denied the suppression motions, Salamon's trial commenced on April 2, 1991.

## SALAMON'S TRIAL

During Salamon's trial, and as the State's first witness, one of the police officers testified about the victim's pretrial identification of Salamon and described the victim's inability to make a positive identification of Salamon. The officer, over Salamon's objections (relevance and hearsay), recounted presentation of the eight photographs to the victim and her remark, when asked whether she saw the robber's photograph in the group, that the depicted Salamon "looks like" the robber, although she was unable to "positively" state that the man in the photograph was the robber. The officer, again over Salamon's objections (relevance and hearsay), also testified that the victim commented, on entering the lineup viewing room at the police station and observing the lineup for possible identification of the robber: "I think I see him already," and later stated regarding identification of her robber that that "looks like him. . . . I think that's him . . . ."

Next, the victim testified concerning the events surrounding the robbery. A few days before the robbery, a woman came to the front door of the victim's home and said that the woman's car, with her baby inside, was stalled. The woman, who was unknown to the victim, asked to use the victim's telephone to call her husband. After some telephone calls, the woman said that she was in rather dire financial straits. Since it was near Thanksgiving, the victim gave the woman money for cabfare and informed her that rather than repayment, the money could be "passed on" by the woman to anyone else in need. The woman left. A day or so later, the victim received a telephone call from a woman named "Johnston," who identified herself as the woman who had appeared at the victim's house and received the money from the victim. The caller then asked whether the victim would pay the caller's utility bill of $70. The victim agreed to pay the bill. The woman came to the victim's house, got the $70, and assured the victim that the money would be repaid.

The next day, the victim received another call from the "Johnston" woman, who said that her husband was on his way to the victim's house to repay the $70. Around 4 p.m. that day, while there was still daylight, the victim observed a man walking up the driveway to her house. The man rang the doorbell and, when the victim answered and opened the door, said that he wanted to use the victim's phone to call his wife. As the man entered the house, he grabbed the victim's hands; wrestled her to the floor; and, using strips of cloth, proceeded to tie her hands in front of her and then tie her feet. After binding the victim, the intruder blindfolded her with another strip of cloth, but the blindfold was apparently somewhat askew, so that the victim saw the man search near her refrigerator, pull out kitchen drawers, and pick up her wallet, which contained approximately $50. The man also found the victim's coin purse, containing some loose change. Soon after the man left, the victim untied her hands, unbound her feet, removed the blindfold, and ran to a neighbor's house from which police were summoned. When the police arrived, the victim gave them the cloth strips that had been used to bind and blindfold her. When asked at trial whether she saw her robber in the courtroom, the victim stated, while pointing to Salamon: "Well, he looks like him . . . is all I'll say. I, again, I'm not positive."

The State then called Trudie Bruce as a witness. Bruce, also charged with robbing the victim, gave a detailed account of the background for the robbery. Bruce and Salamon were sharing an apartment. After selecting their victim, Bruce and Salamon planned the robbery. Pursuant to their plan, Salamon waited a few blocks from the victim's house, while Bruce went to the victim's home and told a story of misfortune about the stalled car and financial distress, all as related during the victim's testimony. During Bruce's visit with the victim, Bruce was actually on a "scouting mission," reconnaissance to find out where the victim might keep any money. As a result of this visit, Bruce believed that the victim's money might be located on or around the refrigerator in the victim's kitchen or within drawers in that vicinity. After receiving the cabfare from the victim, Bruce rejoined Salamon, who said that the victim must have "lots of money," and the pair returned to Bruce's apartment. To

further carry out the planned robbery, Bruce telephoned the victim the next day, identified herself as "Julie Johnston," a "phony name," and asked for $70 to pay her utility bill. Later that day, Bruce, now identified as "Johnston," went to the victim's home and received $70 from her. That evening, at Bruce's apartment, Salamon used cloth strips, cut from sheets in Bruce's apartment, to bind Bruce's hands and feet in a rehearsal for binding the victim during the prospective robbery. During her testimony, Bruce identified the cloth strips which the victim had delivered to police after the robbery as the cloth strips used in the rehearsal and, also, identified Salamon in court as her accomplice in the robbery.

Bruce further testified that she called the victim the next day with the message that her husband would be coming to the victim's house to repay the money used for the utility bill. Bruce accompanied Salamon to within a few blocks of the victim's home and awaited Salamon's return after the robbery. Some 15 minutes later, Salamon came running toward Bruce and, with Bruce following at a distance, dashed through alleys and yards in the neighborhood. When the two finally stopped together, Salamon said that he had tied up the victim, ransacked the house, and taken around $50 from the victim's wallet. The pair telephoned one of Bruce's friends, who came to a designated location and picked up Bruce and Salamon. Later, Bruce and Salamon jointly spent the money taken from the victim. On December 1, 1990, Bruce was arrested on a charge unrelated to the robbery.

The final witness against Salamon was Allen M. Godbolt, who, at the time of Salamon's trial, was confined in the Douglas County Correctional Center, where Salamon was also confined while awaiting trial. Godbolt, who knew Salamon before the two were confined together in the correctional center, testified that on two or three occasions in mid-February 1991, Salamon had talked with him about the pending robbery charge against Salamon and admitted to Godbolt that he and a woman named "Trudie" had robbed an elderly woman. In talking with Godbolt, Salamon identified the victim by name, that is, by the name of the victim who had just testified in Salamon's trial and identified him in court. According to Godbolt, Salamon had

hoped that the victim was "too old to possibly identify him [Salamon]."

After Salamon declined to testify and offered no evidence, the jury found him guilty of robbing the victim. When the court later imposed sentence for that conviction, Salamon appealed.

## SUPPRESSION OF EVIDENCE

Salamon contends that the district court erred in denying his pretrial suppression motions and that, therefore, certain evidence was admitted in violation of his constitutional rights specified in the suppression motions. However, examination of the record discloses that Salamon did not renew his objections based on constitutional grounds when evidence was presented in his trial.

In a criminal trial, after a pretrial hearing and order denying a defendant's motion to suppress evidence, the defendant must object at trial to admission of the evidence which was the subject of the suppression motion in order to preserve an appellate question concerning admissibility of that evidence. See, *State v. Roggenkamp*, 224 Neb. 914, 402 N.W.2d 682 (1987); *State v. Pointer*, 224 Neb. 892, 402 N.W.2d 268 (1987).

"If a party does not make a timely objection to evidence, the party waives the right on appeal to assert prejudicial error." *State v. Archbold*, 217 Neb. 345, 352, 350 N.W.2d 500, 505 (1984). Accord *State v. Roggenkamp, supra*. "In the absence of plain error, when an issue is raised for the first time in an appellate court, the issue will be disregarded inasmuch as a trial court cannot commit error regarding an issue never presented and submitted for disposition in the trial court." *State v. Oldfield*, 236 Neb. 433, 438, 461 N.W.2d 554, 559 (1990). Accord, *State v. Dixon*, 237 Neb. 630, 467 N.W.2d 397 (1991); *State v. Vrtiska*, 225 Neb. 454, 406 N.W.2d 114 (1987). "Generally, a constitutional question not properly raised in the trial court will not be considered on appeal." *State v. Oldfield*, 236 Neb. at 439, 461 N.W.2d at 559. Accord *State v. Fleming*, 223 Neb. 169, 388 N.W.2d 497 (1986).

Since none of Salamon's objections to evidence at his trial were based on constitutional grounds, we cannot and, therefore, do not consider Salamon's assignment of error

regarding suppression and exclusion of evidence on constitutional grounds.

## RELEVANCE OF VICTIM'S
## IDENTIFICATION TESTIMONY

In his second assignment of error, Salamon asserts that the police officer's testimony concerning the robbery victim's pretrial identification was irrelevant and, therefore, should have been excluded "because of the lack of positive identification on the part of the victim," brief for appellant at 8, and because such testimony made "it appear as though the victim of this crime had positively identified the Defendant as the perpetrator of this crime," brief for appellant at 7.

"Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Neb. Evid. R. 401. Neb. Evid. R. 402 provides in part: "Evidence which is not relevant is not admissible."

> "There are two components to relevant evidence: materiality and probative value. Materiality looks to the relation between the propositions for which the evidence is offered and the issues in the case. If the evidence is offered to help prove a proposition which is not a matter in issue, the evidence is immaterial. What is 'in issue,' that is, within the range of the litigated controversy, is determined mainly by the pleadings, read in the light of the rules of pleading and controlled by the substantive law. . . .

> "The second aspect of relevance is probative value, the tendency of evidence to establish the proposition that it is offered to prove. . . ." . . . "[T]he function of the doctrine of relevance is to require that there be some rational connection between the evidence offered by a litigant and the legal rule on which he claims a right to recover. . . . 'Relevancy . . . exists only as a relation between an item of evidence and a matter properly provable in the case.' "

*State v. Baltimore*, 236 Neb. 736, 740-41, 463 N.W.2d 808, 812 (1990). Accord, *State v. Thomas*, 240 Neb. 545, 483 N.W.2d 527 (1992); *State v. Coleman*, 239 Neb. 800, 478 N.W.2d 349

(1992); *State v. Messersmith*, 238 Neb. 924, 473 N.W.2d 83 (1991). "To be relevant, evidence must be rationally related to an issue by a likelihood, not a mere possibility, of proving or disproving an issue to be decided." *State v. Lonnecker*, 237 Neb. 207, 210, 465 N.W.2d 737, 740-41 (1991). Accord, *State v. Lomack*, 239 Neb. 368, 476 N.W.2d 237 (1991); *State v. Coleman, supra.*

> [R]elevancy of offered evidence and exclusion of relevant evidence involve a trial court's discretion. Thus, whether a particular item of evidence has probative value and is, therefore, relevant, see Neb. Evid. R. 401 (Neb. Rev. Stat. § 27-401 (Reissue 1985)), or whether an item of evidence, although relevant, is excludable on account of the danger of unfair prejudice, confusion of issues, misleading the jury, undue delay in the proceedings, waste of time, or needless presentation of cumulative evidence, see Neb. Evid. R. 403 (Neb. Rev. Stat. § 27-403 (Reissue 1985)), may depend on a trial court's exercise of judicial discretion.

*State v. Juhl*, 234 Neb. 33, 42, 449 N.W.2d 202, 209 (1989). Accord *State v. Messersmith, supra*. See, also, *State v. Reynolds*, 235 Neb. 662, 457 N.W.2d 405 (1990) (relevance of offered evidence, otherwise admissible, involves the discretion of a trial court, whose ruling on relevance will be upheld on appeal unless the trial court abused its discretion); *State v. Baltimore, supra* (a trial court's ruling on the relevancy of evidence will not be disturbed on appeal unless there has been an abuse of discretion); *State v. Porter*, 235 Neb. 476, 455 N.W.2d 787 (1990). Thus, a determination whether evidence is relevant is within a trial court's discretion, and, in the absence of an abuse of discretion, the trial court's ruling on relevance will be upheld on appeal. See, *State v. Baltimore, supra*; *State v. Reynolds, supra*; *State v. Porter, supra*; *State v. Juhl, supra*.

Because Salamon was charged with robbing the victim, evidence of Salamon's identity as the robber is definitely material and probative and is, therefore, relevant. Although the victim's identification of Salamon as the robber was expressed with less than absolute positiveness or categorical conclusiveness, the degree of certainty and, correspondingly,

uncertainty in the victim and her identification of Salamon were matters of witness credibility and weight of testimony. A witness' credibility and weight to be given to testimony are matters for determination and evaluation by a fact finder. See, *State v. Williams*, 224 Neb. 114, 396 N.W.2d 114 (1986); *State v. Robertson*, 223 Neb. 825, 394 N.W.2d 635 (1986).

Consequently, we find no abuse of discretion by the trial court in admitting the victim's identification testimony as relevant evidence in Salamon's trial and, hence, conclude that Salamon's second assignment of error is without merit.

### SALAMON'S HEARSAY OBJECTIONS

In his third and final assignment of error, Salamon claims that the police officer's testimony relating the victim's out-of-court statement that she identified Salamon as the robber is hearsay and, pursuant to Salamon's hearsay objection, should have been excluded.

Neb. Evid. R. 801 provides:

(3) Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted; and

(4) A statement is not hearsay if:

(a) The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (i) inconsistent with his testimony and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or (ii) consistent with his testimony and is offered to rebut an express or implied charge against him or recent fabrication or improper influence or motive . . . .

Neb. Evid. R. 802 provides: "Hearsay is not admissible except as provided by these rules or by other rules adopted by the statutes of the State of Nebraska."

In Salamon's trial, the police officer testified before the victim took the stand. Consequently, when the officer testified concerning the victim's pretrial identification of Salamon, the victim had not contradicted her previous identification of Salamon, repudiated that pretrial identification, or indicated that she could not recall the identification.

The State argues that the officer's testimony containing the victim's out-of-court identification of Salamon was not hearsay, because the testimony "was offered to explain why [police] went to [Salamon's] home to arrest him and not for the truth of the matter asserted." Brief for appellee at 28. Thus, the State contends that the victim's out-of-court identification of Salamon was admissible through the officer's testimony to show that police had probable cause to arrest Salamon.

In *State v. Smith*, 218 Neb. 201, 352 N.W.2d 620 (1984), we considered the State's contention that results of an "Alco-Sensor" were admissible as substantive evidence to prove a drunk driving charge against the defendant. An Alco-Sensor is an instrument which does not measure a person's blood alcohol level, but may confirm a police officer's suspicion that an individual has been drinking alcohol, and is "used as an ingredient for probable cause to arrest and require a postarrest test of blood, breath, or urine . . . ." 218 Neb. at 206, 352 N.W.2d at 624. In concluding that the result or reading from the Alco-Sensor, as a preliminary breath test, was irrelevant, we stated:

> As a matter involving probable cause, any aspect of the breath test was a matter of law for judicial determination, not evidence for the jury. . . . The result of the preliminary breath test was irrelevant to prove any aspect of the charge against Smith. Under the circumstances it was error to place before the jury any evidence regarding the result from the Alco-Sensor.

218 Neb. at 206, 352 N.W.2d at 624. Thus, existence of probable cause, as a prerequisite determinant for admissibility of evidence obtained by a search or arrest, is a preliminary question for a court as a judicial function without intervention of a jury. See Neb. Evid. R. 104 (preliminary questions concerning admissibility of evidence shall be determined by the judge). Under Rule 104, a trial court makes preliminary determinations in relation to constitutional protection from unreasonable searches and seizures; therefore, whether police had reasonable or probable cause to believe that a felony had been committed or was being committed, whether there was sufficient basis for issuance of a warrant, whether seized

evidence was within the scope of a warrant, and whether there was consent to a search are all preliminary questions of fact to be decided by a judge, who makes the final decision on admissibility outside the hearing of the jury and preferably, even sometimes necessarily, before trial. See 1 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence ¶ 104[07] (1992).

Under the circumstances, the victim's pretrial identification of Salamon, as an aspect or basis of probable cause to arrest him, fails to justify admissibility contrary to the prohibition against hearsay. Rather, in Salamon's trial the officer testified concerning the victim's pretrial identification of Salamon, the victim's out-of-court statement as an assertion that Salamon was the man who robbed her.

Although several decisions of this court have dealt with constitutional considerations of witness identification relative to a criminal trial, Salamon's appeal appears to be the first occasion when this court has been asked to address the issue of a hearsay objection to evidence of a witness' pretrial or out-of-court identification of a defendant.

The Nebraska Evidence Rules have several counterparts in the Federal Rules of Evidence, or are otherwise patterned on the federal rules. Fed. R. Evid. 801(d) provides: **"Statements which are not hearsay.**—A statement is not hearsay if—(1) **Prior statement by witness.**—The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . (C) one of identification of a person made after perceiving the person . . . ."

One commentator has made the following observation regarding federal Rule 801(d)(1)(C):

> The theory is that courtroom identification is so unconvincing as practically to impeach itself thus justifying the corroboration. The purpose of the rule is to "permit the introduction of [more meaningful] identifications made by a witness when memory was fresher and there had been less opportunity for influence to be exerted upon him." The circumstances of the prior identification may, of course, be considered by the trier of fact in determining the weight to be accorded.

Michael H. Graham, Handbook of Federal Evidence § 801.13

at 767-68 (3d ed. 1991), quoting from *United States v. Marchand*, 564 F.2d 983 (2d Cir. 1977). See, also, *Gilbert v. California*, 388 U.S. 263, 273 n.3, 87 S. Ct. 1951, 18 L. Ed. 2d 1178 (1967): "[T]he earlier identification has greater probative value than an identification made in the courtroom after the suggestions of others and the circumstances of the trial may have intervened to create a fancied recognition in the witness' mind." With the identification provision included in federal Rule 801(d)(1)(C), the Federal Evidence Rules were enacted by Congress in 1975.

In 1973, the Nebraska Supreme Court Committee on Practice and Procedure published the Proposed Nebraska Rules of Evidence. The Nebraska committee compared the then pending or proposed federal rules with the proposed Nebraska rules and, in its comment for proposed Nebraska Rule 801(d)(1), which corresponded with federal Rule 801(d)(1), stated: "**Subdivision (d)(1)(C)** [of the Federal Rules of Evidence] was not recommended by the Nebraska Committee." Rule 801(d)(1) cmt. (Tentative Draft 1973). Thus, the Nebraska committee, in preparing the proposed Nebraska Rules of Evidence, considered the identification provision of federal Rule 801(d)(1)(C), but expressly rejected that provision. After the Nebraska committee's publication of its comments in conjunction with the proposed rules of evidence for Nebraska, the Nebraska Legislature in 1975 enacted the Nebraska Evidence Rules as chapter 27 of the Revised Statues of Nebraska.

Thus, while federal Rule 801(d)(1)(C) classifies a witness' pretrial identification as a nonhearsay statement, Nebraska Rule 801(4)(a) does not contain such classification and provision and, in fact, makes no mention whatsoever concerning witness identification as a nonhearsay statement. None of the other Nebraska Rules of Evidence or other Nebraska statutes authorize admissibility of a witness' pretrial identification of a defendant as a nonhearsay statement or statement otherwise exempted or excluded from the operation and purview of the "hearsay rule," Rule 802, prohibiting admission of hearsay. Consequently, in the absence of admissibility authorized under the Nebraska Evidence Rules or

by other statute, a witness' pretrial statement identifying a defendant as the perpetrator of a crime is hearsay pursuant to Rule 801(3) and, therefore, is inadmissible as the result of Rule 802. This is not to say that a witness' pretrial identification of a defendant may never be admissible. Never say never. A witness' pretrial identification may be admissible in certain circumstances encompassed within the Nebraska Evidence Rules, for example, for the purpose of impeachment. See Neb. Evid. R. 613. Other instances of admissibility of a pretrial identification of a defendant are left to another day in other situations in future cases. See R. Collin Mangrum, *Doesn't Anyone in Nebraska Realize That Pretrial Identification Testimony Raises Hearsay as Well as Constitutional Issues?*, 20 Creighton L. Rev. 335 (1986-87). Whether Rule 801(4)(a) is amended to authorize admissibility of a witness' pretrial identification of a defendant remains to be seen and is a legislative matter involving the Nebraska Evidence Rules. We note that, at last count, 5 state jurisdictions, including Nebraska, have rejected the nonhearsay witness identification provision of federal Rule 801(d)(1)(C), while 25 other states have adopted, verbatim or in substance, the witness identification provision of federal Rule 801(d)(1)(C). 4 Weinstein & Berger, *supra*, ¶ 801(d)(1)(C)[02]. Nonetheless, in Salamon's case, the officer's testimony containing the victim's out-of-court assertion that Salamon was her robber is hearsay and was erroneously admitted.

However, our inquiry does not end with the erroneous admission of hearsay against Salamon. The ultimate question is whether the erroneous admission of hearsay was prejudicial to Salamon.

"In a jury trial of a criminal case, whether an error in admitting or excluding evidence reaches a constitutional dimension or not, an erroneous evidential ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt." *State v. Cox*, 231 Neb. 495, 504, 437 N.W.2d 134, 140 (1989). Accord, *State v. Lonnecker*, 237 Neb. 207, 465 N.W.2d 737 (1991); *State v. Coleman*, 239 Neb. 800, 478 N.W.2d 349 (1992).

"Harmless error exists in a jury trial of a criminal case when

there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence the jury in a verdict adverse to a substantial right of the defendant." *State v. Watkins*, 227 Neb. 677, 686, 419 N.W.2d 660, 666 (1988). Accord, *State v. Cox, supra*; *State v. Dixon*, 237 Neb. 630, 467 N.W.2d 397 (1991); *State v. Coleman, supra*. "In the trial of a criminal case, erroneous admission of evidence which is not cumulative may constitute harmless error beyond a reasonable doubt, when a defendant's conviction is supported by overwhelming evidence which has been properly admitted or admitted without objection." *State v. Coleman*, 239 Neb. at 814, 478 N.W.2d at 358.

The admission of the officer's testimony containing the hearsay in question was harmless error. A brief review of the evidence shows that the victim made an in-court identification of Salamon. More important is the testimony of Trudie Bruce, Salamon's accomplice in the robbery. Bruce's testimony was a detailed corroboration of the victim's account of the robbery, and it supplied considerable damaging evidence against Salamon, including a lengthy description of events before, during, and after the robbery. Additionally, Bruce identified Salamon as the man who was her accomplice in robbing the victim. One cannot ignore Salamon's admissions to Godbolt. Disregarding the hearsay presented through the police officer's testimony, we conclude that the remaining evidence establishing Salamon's guilt of the robbery is overwhelming and that beyond a reasonable doubt, any error in the trial court's admitting hearsay concerning the victim's pretrial identification of Salamon is harmless under the circumstances.

Having found no reversible error in Salamon's trial, we affirm Salamon's conviction.

AFFIRMED.