STATE OF NEBRASKA, APPELLEE, V. DANIEL D. SCHREIN, APPELLANT.

504 N.W.2d 827

Filed September 3, 1993.    No. S-91-518.

J. William Gallup, of Gallup & Schaefer, for appellant.

Don Stenberg, Attorney General, James H. Spears, and Barry Waid for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, FAHRNBRUCH, and LANPHIER, JJ.

PER CURIAM.

Daniel D. Schrein was found guilty in a jury trial of five counts of sexual assault of a child, a Class IV felony. The Nebraska Court of Appeals reversed Schrein's convictions and remanded the cause for a new trial. *State v. Schrein*, 1 NCA 1581 (1992). The State petitioned for, and this court has granted, further review pursuant to Neb. Rev. Stat. § 24-1107 (Cum. Supp. 1992). We reverse the judgment of the Court of Appeals.

## FACTUAL BACKGROUND

Schrein was a pediatrician practicing for many years in Omaha, where he also organized and coached a youth sports organization known as The Gladiators. In September 1990, Schrein was arrested on five charges of sexual assault of a child. Testimony at Schrein's trial included that of 15 young men who claimed that Schrein had molested them. In addition, expert testimony was presented which contradicted Schrein's claim that his actions were a normal part of treating his young male patients. Defense witnesses included Schrein himself, numerous former patients, members of The Gladiators and their parents, and an Omaha pediatrician who testified regarding the treatment of young males. The jury found Schrein guilty on all five counts.

Schrein appealed his conviction to the Court of Appeals. In that appeal, the principal question was the admission of a Redbook magazine article on pedophilia offered by the State to rehabilitate the testimony of one of the State's witnesses, Sgt. Kenneth Bovasso. During direct examination, Sergeant Bovasso testified that he supervised the robbery and sexual assault unit of the Omaha Police Division and had worked on the Schrein case. On cross-examination, Sergeant Bovasso testified as follows:

Q- . . . Didn't you talk to [M.M.]?

A- Yes, I said I did, yes.

Q- Wasn't there some discussion with her about pedophiles?

A- Yes.

Q- Didn't you give her literature on pedophiles?

. . . .

A- I told her that we— .

Q- Just answer yes or no. Did you tell her that Dr. Schrein was a pedophile?

A- No.

. . . .

Q- Did you make that implication?

A- I— No.

Q- Why did you give her literature on pedophiles?

A- Because we were investigating a case possibly of that nature.

Q- Okay. And you were convinced and told her that Dr. Schrein was a pedophile; isn't that true?

A- I didn't tell her that Dr. Schrein was a pedophile.

On redirect, the prosecutor gave Sergeant Bovasso exhibit 60, a photostatic copy of the article regarding pedophilia published in the August 1987 issue of Redbook magazine and asked:

Q- . . . Officer, did you give that article to [M.M.]?

A- Yes.

Q- Did you give it to anybody else connected to the investigation?

A- Yes.

Q- Do you know who else or how many others?

A- Several others, but I know [another mother] got a copy of it.

Q- Is that a true and accurate copy of the article as you handed it out to [M.M.]?

A- Yes.

[Prosecutor]: I'd offer what's been marked as Exhibit 60.

[Schrein's lawyer]: I'll object. It's irrelevant. . . .

THE COURT: Just a second, please. I believe on cross-examination, if I recall correctly, . . . you asked the

officer about the materials that he gave.

[Schrein's lawyer]: I asked him if he gave [M.M.] something on pedophilia. . . .

THE COURT: With that in mind, I think the exhibit will be received. The objection, therefore, is overruled.

Exhibit 60 was a copy of a five-page article entitled "The Child Abuser: How Can You Spot Him?" which appeared in Redbook magazine in August 1987 and was coauthored by a professor of psychiatry and his wife. The lead-in paragraph, printed in large, bold letters, proclaimed:

He's a man you trust. He's a man your children trust. He's a teacher, a coach, a Cub Scout leader—someone your family knows well. And he's much more likely to sexually abuse little boys than little girls, according to a landmark study of 403 sex offenders. In this shocking report, the doctor who headed the research team offers a profile of the typical child abuser—and tells you how to protect your children.

Gene G. Abel & Nora Harlow, *The Child Abuser: How Can You Spot Him?*, Redbook, Aug. 1987, at 98. In this article, the authors state:

Most of us think that a child molester is a rather slimy individual—a stranger in town, sitting in his car near a schoolyard, luring children with candy. Our findings reveal that, on the contrary, the child molester is not a stranger, but is someone we know well. He often is a man we trust, a man our children trust.

Many child molesters try to move themselves into positions or occupations within the community that will allow them to spend time alone with children without attracting much notice. Molesters often become youth ministers, day-care workers, Boy Scout leaders, teachers, Big Brothers and *pediatricians*.

. . . And indeed, among physicians—as among youth ministers, day-care workers and teachers—there are exceedingly few men who are child molesters. But there are a few. Of the several hundred molesters I've treated in the last two years, one was a school physician, two were child psychiatrists, another was a *pediatrician*.

(Emphasis supplied.) *Id*. at 99. Finally, the article suggests that parents can spot a child molester by watching for typical operating procedures that include spending excessive amounts of time with children and arranging to take trips alone with children; seeking out positions, such as school physician or coach, that will allow them to spend time alone with children; and abusing the privileges of their positions to engage children in inappropriate activities.

Later, after exhibit 60 had been received in evidence, the exhibit was the subject of an in-chambers discussion:

[Schrein's lawyer]: My question is: What was the purpose of the offer? What were they trying to prove with that offer? Unless they can give you some representation of relevance then it shouldn't be admissible. For example, Judge, if they offered a Playboy magazine simply because I asked the question and they offered it, you wouldn't let the Playboy in because you'd have to have something relevant to this case. And I'm saying what does that article got [sic] to do with whether Dr. Schrein's guilty of the charges?

THE COURT: It has nothing to do with whether the doctor's guilty or innocent of these charges, but it has everything to do with what the officer did in his interviews with regard to [M.M.] and what he did in connection with others. And in view of the previous testimony on cross-examination with regard to what he distributed, I think it becomes relevant.

When M.M. testified as a witness for Schrein, she did not recall that Sergeant Bovasso had implied that Schrein was a "pervert." M.M. mentioned nothing about the magazine article as a part of Sergeant Bovasso's interview of M.M.

In his appeal to the Court of Appeals, Schrein contended that the magazine article was both irrelevant and unfairly prejudicial. The State argued that the article was relevant to the question of whether Sergeant Bovasso had made improper suggestions to the parents with whom he had spoken and that these suggestions were passed along to their children, thus encouraging them to testify falsely. In its brief on appeal, the State asserted: "What was this sinister material that this officer

was distributing to upset children and their parents? It was only an article from a popular women's magazine." Brief for appellee at 35-36.

A second issue on appeal involved the testimony of Schrein's nurse, Myra Langenfeld, regarding her opinion about a picture hanging in one of Schrein's examining rooms which depicted a teenager or young man in a standing position with no shirt but wearing hip-huggers, or low-cut jeans. According to Langenfeld, the boy in the picture "had his head tilted back and a smile on his face. And Dr. Schrein referred to it as a 'cocky smile.' " Schrein's lawyer did not object to Langenfeld's description of the picture. However, when Langenfeld was asked what she did not like about the picture, Schrein objected that it was "immaterial, irrelevant. It has nothing to do with this case. It's a conclusion on the part of the witness." The court overruled the objection but allowed Schrein's lawyer to ask several foundational questions. During his foundational examination, Schrein's lawyer asked Langenfeld if there was anything obscene about the picture. She replied, "I thought it looked sexy. . . . It looked suggestive to me. . . . I don't think it was appropriate." At the end of his foundational examination, Schrein's lawyer again objected to Langenfeld's testimony because she had admitted that she knew nothing about art and, therefore, her opinion of the picture was irrelevant. His objection was overruled. After the foundational examination, the State, over Schrein's relevancy objections, continued questioning Langenfeld about her opinion of the picture. She testified that she was "embarrassed" by the picture and that she had told Schrein that she did not care for the picture.

## COURT OF APPEALS' DECISION
The Court of Appeals stated:

> The important fact was that Bovasso passed out literature on pedophilia. Beyond that, the exact wording of the literature had perhaps an infinitesimal impact on the credibility of Bovasso and had no material value to any issue of consequence in the case.
>
> Bovasso, his credibility, and the nature of the literature he distributed were not facts of consequence in this case.

They were not matters in issue. They were not within the range of the litigated controversy. The testimonial evidence given at trial contained the factual evidence of consequence. Evidence concerning factual questions about the literature Bovasso passed out was irrelevant because matters related to Bovasso's distribution of literature were not material facts on which the case turned.

*State v. Schrein*, 1 NCA 1581, 1588-89 (1992). The Court of Appeals also stated:

Had it been material and probative, exhibit 60 still should not have been admitted into evidence because relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, see Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 1989), and the article's dubious probative value was dwarfed by its prejudicial effect. . . .

The trial court abused its discretion and erred by admitting exhibit 60, because the article was irrelevant to any material issue of fact, and its tendency to create unfair prejudice substantially outweighed whatever probative value it may have possessed.

1 NCA at 1589-90. Concerning the picture in Schrein's examining room, the Court of Appeals held: "The tendency of the testimony about the picture to create unfair prejudice substantially outweighs any probative value it might arguably have. The court should have excluded the testimony concerning the picture." 1 NCA at 1593. Finally, the Court of Appeals concluded:

The judgment of the district court is reversed, which reversal results, first, from the unbridled prosecutorial zeal in offering the Redbook article (with strategically placed underlining) and, second, from the failure of the trial court to intercept the magazine article, which was of dubious relevancy, but was obviously extremely prejudicial to the appellant, Schrein, and potentially highly inflammatory to the jury.

1 NCA at 1594.

## ASSIGNMENTS OF ERROR

In its petition for further review, the State asserts that the Court of Appeals erred by concluding that the magazine article should not have been received into evidence and holding that testimony regarding the picture in Schrein's examining room should have been excluded.

## ADMISSION OF THE MAGAZINE ARTICLE

The trial court held that although the article "has nothing to do with" whether Schrein is guilty or innocent of the charges against him, "it has everything to do with what the officer did in his interviews with regard to [M.M.] and what he did in connection with others. And in view of the previous testimony on cross-examination with regard to what he distributed, I think it becomes relevant."

Under Neb. Rev. Stat. § 27-106 (Reissue 1989):

(1) When part of an act, declaration, conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other. When a letter is read, all other letters on the same subject between the same parties may be given. When a detached act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood, or to explain the same, may also be given in evidence.

(2) The judge may in his discretion either require the party thus introducing part of a total communication to introduce at that time such other parts as ought in fairness to be considered contemporaneously with it, or may permit another party to do so at that time.

Because § 27-106 is concerned with the danger of admitting a statement out of context, additional evidence is admissible only if it qualifies or explains the previous testimony. See *Chirnside v. Lincoln Tel. & Tel. Co.*, 224 Neb. 784, 401 N.W.2d 489 (1987). In addition, under § 27-106, when defense counsel leaves a false impression, the trial court may allow the use of otherwise inadmissible evidence to clarify or complete an issue opened up by defense counsel. *United States v. Womochil*, 778 F.2d 1311 (8th Cir. 1985). See, also, *U.S. v. Durham*, 868 F.2d

1010 (8th Cir. 1989), *cert. denied* 493 U.S. 954, 110 S. Ct. 366, 107 L. Ed. 2d 352.

Section 27-106 is included in article 1, the "General Provisions" section, of the Nebraska Evidence. Rules. As explained by the drafters' comment, the predecessor to § 27-106 was applied repeatedly to admit explaining matter that otherwise might not have been admissible as hearsay, opinion, or the like. See *Spani v. Whitney*, 172 Neb. 550, 110 N.W.2d 103 (1961). Furthermore, although § 27-106 differs from Fed. R. Evid. 106, the drafters of the Nebraska rule believed that there was no significant difference between the rules and that the Nebraska rule was simply a more accurate statement of the rule of completeness. See Rule 107 cmt. (Tentative Draft 1973). Thus, federal decisions and commentary may be helpful in determining the scope of admissibility of evidence under Nebraska's Rule 106.

Because § 27-106 applies only if part of the act, declaration, conversation, or writing has been "given in evidence," we must first determine whether Schrein introduced the Redbook article during his cross-examination of Sergeant Bovasso. In *Durham*, the defendant, on direct examination, elicited testimony from a witness that an unnamed man had been looking for the murder victim on the day of his death. During cross-examination, the government elicited testimony from the same witness that the unnamed man was in fact a landlord or Realtor who was looking to lease or sell the victim property. On appeal, Durham argued that the latter testimony was inadmissible hearsay and that it prejudiced him because it rebutted his theory that someone else had committed the murder. The Eighth Circuit held, however, that Durham's direct examination could have led the jury to believe that the unnamed man had committed the murder, and that the government must be afforded the opportunity to clear up that false impression.

In Schrein's case, during cross-examination of Sergeant Bovasso by Schrein's lawyer, Sergeant Bovasso was asked a series of questions regarding his conversation with M.M. during his investigation of Schrein, including two questions relating to the Redbook article: "Didn't you give her literature on pedophiles?" and "Why did you give her literature on

pedophiles?" Schrein's lawyer also asked if Sergeant Bovasso had implied that Schrein was a pedophile, to which Sergeant Bovasso responded, "No."

The State contends that Schrein's mention of the article served to introduce it into evidence, just as in *Durham*, the mere mention that an unnamed man had been looking for the murder victim on the day of his death was sufficient to open the door to further testimony on the subject.

However, our inquiry does not stop there. According to the advisory committee's notes, one of the purposes behind federal Rule 106 is to allow a party to correct a misleading impression created when part of a statement is taken out of context. In *U.S. v. Velasco*, 953 F.2d 1467 (7th Cir. 1992), the Seventh Circuit held that under federal Rule 106, the trial court must determine whether the additional evidence which the proponent seeks to admit is relevant to the issues in the case and, furthermore, the trial court need admit only that part of the evidence which qualifies or explains the evidence offered by the opponent. See, also, *United States v. McCorkle*, 511 F.2d 482 (7th Cir. 1975), *cert. denied* 423 U.S. 826, 96 S. Ct. 43, 46 L. Ed. 2d 43; *U.S. v. Pendas-Martinez*, 845 F.2d 938 (11th Cir. 1988). As the *Velasco* court explained, the test under federal Rule 106 is conjunctive:

> Once relevance has been established, the trial court then must address the second half of the test, and should do so by asking (1) does it explain the admitted evidence, (2) does it place the admitted evidence in context, (3) will admitting it avoid misleading the trier of fact, and (4) will admitting it insure a fair and impartial understanding of all of the evidence.

*Velasco*, 953 F.2d at 1475. See, also, *United States v. LeFevour*, 798 F.2d 977 (7th Cir. 1986).

The State contends that Schrein's questioning of Sergeant Bovasso left the jury with the false impression that the literature which Bovasso distributed "contained something sinister about doctors and pedophiles" which had improperly influenced witnesses. Brief for appellee in support of petition for further review at 4. Therefore, the State asserts that the article was necessary to rehabilitate the testimony of Sergeant Bovasso and was admissible under § 27-106.

In admitting the article, the trial court explained that although the article

> [had] nothing to do with whether the doctor's guilty or innocent of these charges . . . it has everything to do with what the officer did in his interviews with regard to [M.M.] and what he did in connection with others. And in view of the previous testimony on cross-examination with regard to what he distributed, I think it becomes relevant.

Thus, according to the trial court, although the article was not relevant to the ultimate issue in the case, it was necessary to explain what Sergeant Bovasso had done during his investigation of Schrein, the very subject of Schrein's cross-examination. Thus, cross-examination of Sergeant Bovasso opened the door for the magazine article. This explanation conforms with the purpose of § 27-106.

The State also complains about the finding of the Court of Appeals that the article was unfairly prejudicial to Schrein. See Neb. Rev. Stat. § 27-403 (Reissue 1989).

As Wright and Graham point out:

> The rule at common law was that the opponent was entitled to put in the whole on the same subject if it was relevant. The only limitation was that if the remainder was not only inadmissible but was prejudicial to the proponent, the judge had discretion to exclude it. . . .
>
>  . . . .
>
>  . . . [I]f the material sought to be required for completeness is such that prejudice to the proponent or another party or the danger of confusion of the jury outweighs the explanatory value of the material, the judge can refuse to admit it. Whether we say that this is because Rule 403 is a Rule that applies even to the completeness doctrine or because the judge applies the elements of Rule 403 in making his determination of what "fairness" requires under Rule 106 is of little moment; the important thing is that this limitation on the common law rule is preserved.

21 Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure: Evidence § 5078 at 373, 378 (1977).

In the present case, however, we need not reach the issue of

whether the Redbook article was unfairly prejudicial to Schrein. An objection, based on a specific ground and properly overruled, does not preserve a question for appellate review on any other ground. See *Havlicek v. State*, 101 Neb. 782, 165 N.W. 251 (1917). Thus, the trial court is required to weigh the danger of unfair prejudice against the probative value of the evidence only when requested to do so at trial. See, *State v. Raywalt*, 436 N.W.2d 234 (N.D. 1989); *State v. Mark*, 286 N.W.2d 396 (Iowa 1979); *McClelland v. State*, 84 Wis. 2d 145, 267 N.W.2d 843 (1978); *U.S. v. Amaechi*, 991 F.2d 374 (7th Cir. 1993), *cert. denied* 61 U.S.L.W. 3835 (U.S. June 14, 1993) (No. 92-8654); *U.S. v. Searing*, 984 F.2d 960 (8th Cir. 1993); *U.S. v. Boney*, 977 F.2d 624 (D.C. Cir. 1992); *U.S. v. Wilson*, 966 F.2d 243 (7th Cir. 1992); *U.S. v. Gomez-Norena*, 908 F.2d 497 (9th Cir. 1990), *cert. denied* 498 U.S. 947, 111 S. Ct. 363, 112 L. Ed. 2d 326.

Schrein objected to the admission of the Redbook article on the grounds of relevancy. The court properly overruled that objection. Had Schrein then interposed an objection on the grounds that the article was unfairly prejudicial, the trial court would have been required to determine whether the otherwise admissible evidence should have been excluded because it was unfairly prejudicial. The trial court was not asked to do so. Because Schrein did not object to the article on the grounds of unfair prejudice, see § 27-403, the trial court had no obligation to exclude it on those grounds. Therefore, although Schrein argued on appeal that the article "was devastating to the defense" and left the defendant "mortally wounded," brief for appellant at 28, 30, the issue of unfair prejudice was not reviewable on appeal.

## ADMISSION OF THE PICTURE

The State also argues that the Court of Appeals erred in ruling that testimony about the picture in defendant's examining room should have been excluded.

Under Neb. Rev. Stat. § 27-402 (Reissue 1989), "[e]vidence which is not relevant is not admissible." "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without

the evidence." Neb. Rev. Stat. § 27-401 (Reissue 1989). Furthermore, as the Court of Appeals correctly noted, in order to be admissible, nonexpert opinion testimony must be " '(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of [the witness'] testimony or the determination of a fact in issue.' " *State v. Schrein*, 1 NCA 1581, 1593 (1992) (quoting Neb. Rev. Stat. § 27-701 (Reissue 1989)). Thus, only if Langenfeld's opinion was rationally based on her perception and would tend to make it more or less probable that Schrein had sexually assaulted his patients was her opinion regarding the picture relevant and admissible.

However, we need not determine the basis of Langenfeld's opinion or its probative value because, as noted above, an appellant cannot object to the receipt of evidence to which it did not so object at trial. See *Havlicek v. State, supra*. Schrein did not object to the testimony of Langenfeld in which she described the picture, nor did he object when, in response to his own question, she stated that she thought the picture was "sexy," "suggestive," and "inappropriate." Any additional testimony regarding Langenfeld's opinion of the picture elicited during direct examination was cumulative and, therefore, would constitute harmless error even if inadmissible. Thus, the Court of Appeals erred in concluding that Langenfeld's testimony about the picture should have been excluded.

## CONCLUSION

For the foregoing reasons, the Court of Appeals erred in holding that the magazine article and the testimony concerning the picture were inadmissible and, therefore, erred in reversing the convictions of Schrein. Therefore, we reverse the judgment of the Court of Appeals and remand this cause to the Court of Appeals with direction to reinstate the judgments on the five convictions of Schrein.

REVERSED AND REMANDED WITH DIRECTION.

SHANAHAN, J., dissenting.

The majority misapplies Neb. Evid. R. 106, Neb. Rev. Stat. § 27-106 (Reissue 1989), in Schrein's case.

On cross-examination, Bovasso testified that during his investigation, he spoke with M.M. and mentioned something

"about pedophiles" in general, but denied that he had stated or implied to M.M. that Schrein was a pedophile. Moreover, in cross-examining Bovasso, counsel never asked about the identity or contents of any "literature" which Bovasso had given to M.M. during their conversation. However, on redirect examination of Bovasso, and over Schrein's relevance objection, a copy of the Redbook article which Bovasso had given to M.M. was received in evidence.

Nebraska's Rule 106 is a principle of completeness and is designed to prevent an act, declaration, conversation, or other writing from being presented in part when another related part of the act, declaration, conversation, or writing is necessary in fairness to supply the entire context so that the parts may be simultaneously considered together as a whole. Thus, the objective of Rule 106 is elimination of mistake or prevention of a misleading initial impression when matters are taken out of context.

For admission under Rule 106, the additional material must be related to the same subject matter and must "tend to explain, modify, qualify or otherwise shed light on the part already received." Michael H. Graham, Handbook of Federal Evidence § 106.1 at 57 (3d ed. 1991). See, also, *U.S. v. Sweiss*, 814 F.2d 1208 (7th Cir. 1987) (the part sought to be admitted must be relevant to the issues and only that part or those parts that qualify or explain the part in evidence may be admitted to avoid misleading the fact finder and ensure a fair understanding of the evidence).

"Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 1989). "To be relevant, evidence must be rationally related to an issue by a likelihood, not a mere possibility, of proving or disproving an issue to be decided." *State v. Lonnecker*, 237 Neb. 207, 210, 465 N.W.2d 737, 740-41 (1991). Accord, *State v. Salamon*, 241 Neb. 878, 491 N.W.2d 690 (1992); *State v. Coleman*, 239 Neb. 800, 478 N.W.2d 349 (1992); *State v. Lomack*, 239 Neb. 368, 476 N.W.2d 237 (1991).

Validation of the State's introduction of the magazine article

under Rule 106 is not supplied by defense counsel's "opening the door." As expressed in 1 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence ¶ 106[01] at 106-10 (1992): "[Fed. R. Evid.] 106 is designed to protect the adversary and not to provide a method to subvert other exclusionary rules." Weinstein and Berger further observe:

> The phrase "opening the door," has been used with such a lack of discrimination, that it would probably be well to eliminate it. One party's errors should not be used as an excuse to compound them. The court should not permit the trial to get out of control. Only if the evidence by one party needs to be met or explained away by the other side does its mere introduction provide independent warrant for the introduction of other evidence.

1 Weinstein & Berger, *supra* at 106-18. " 'Opening the door is one thing. But what comes through the door is another.' " *United States v. Winston*, 447 F.2d 1236, 1240 (D.C. Cir. 1971). In *U.S. v. Brown*, 921 F.2d 1304, 1307-08 (D.C. Cir. 1990), the court stated:

> "Curative admissibility" is a shield, not a sword. Although the government may prevent a defendant from using rules of evidence to select and enter pieces of evidence wholly out of context, the government may not shore up a prosecution by pushing through the open door evidence not "necessary to remove any unfair prejudice" created by defense counsel's tactics. In sum, the range of otherwise-inadmissible evidence that may be squeezed through an "open door" is limited.

Although Rule 106 may have allowed the State to elicit other parts of Bovasso's conversation with M.M., the State instead introduced a document, the magazine article, as the balance of the "same subject" of inquiry during cross-examination of Bovasso. How a document becomes the balance of a conversation is unexplained and remains a puzzlement. Moreover, since Bovasso did not mention or imply that Schrein was a pedophile, in what way did the magazine article eliminate a mistake or prevent a misleading initial impression and thereby make Bovasso's conversation with M.M. more comprehensible?

Admissibility of the Redbook article in Schrein's case is subject to the general requirement of relevance. The State suggests that admission of the magazine article was a response to defense counsel's challenge to Bovasso's credibility and rehabilitated Bovasso's testimony. Actually, in all his testimony concerning the conversation with M.M., Bovasso neither contradicted himself nor supplied any basis for impeachment and damage to his credibility. Just how the article, reciting that child molesters often become pediatricians and referring to psychiatric treatment for an unnamed pedophilic pediatrician, restored or buttressed Bovasso's credibility is unexplained, undoubtedly because the Nebraska Evidence Rules provide no legitimate explanation. Whether the article influenced anyone in Bovasso's investigation would be a conclusion premised on absolute speculation. Furthermore, the issue in Schrein's case was whether he sexually assaulted five children. The article did not tend to prove that Schrein was guilty of the charges because the article presented only general information and contained nothing related to the specific acts involved in the charges against Schrein. Additionally, the record contains no evidence establishing that the article's authors had sufficient expertise for the opinions and conclusions in the article; hence, an evidential foundation for relevance of the authors' expressed opinions and conclusions is totally absent. The magazine article, which might have been entitled "Profile of a Pedophile," stated that some pediatricians were child molesters. As a result of that characterization connecting pediatricians with pedophiles, the accusations against Schrein, a pediatrician, acquired some validity. In that manner, the Redbook article became a witness which Schrein was unable to confront and, therefore, could not cross-examine. Denial of Schrein's right to inquire into such damaging evidence violated his rights to confront and cross-examine witnesses against him.

A conviction of any crime, even sexual assault of a child, must be based on relevant evidence consistent with a defendant's constitutional rights of confrontation and cross-examination necessary for a fair trial. Although some may feel that Schrein "opened the door" for admission of the Redbook article, the door which actually opened was a

152

trapdoor through which fell the constitutional rights to confront and cross-examine adverse witnesses and receive a fair trial. Therefore, the judgment of the Nebraska Court of Appeals should have been affirmed.

WHITE and CAPORALE, JJ., join in this dissent.