STATE OF NEBRASKA, APPELLEE, V. ROBERT E. WATKINS, APPELLANT.

419 N.W.2d 660

Filed February 26, 1988.    No. 86-1012.

Thomas M. Kenney, Douglas County Public Defender, and Timothy P. Burns, for appellant.

Robert M. Spire, Attorney General, and Marie C. Pawol, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, and GRANT, JJ., and COLWELL, D.J., Retired.

SHANAHAN, J.

Robert E. Watkins was charged with burglary, in violation of Neb. Rev. Stat. § 28-507 (Reissue 1985), convicted as the result of a jury trial, and sentenced to imprisonment. Watkins claims errors in his trial, namely, (1) the district court's failure to direct a verdict of acquittal or dismiss the information filed against Watkins, and (2) over Watkins' objection, the district court allowed a rebuttal witness for the State to testify about Watkins' prior inconsistent statement to that witness. We affirm.

After shutting the windows and locking the doors of their house, Norman Terry Arndt and his family left to attend a fireworks display on the evening of July 4, 1986. Officers John Skanes and John Sherman, Omaha policemen on cruiser patrol, drove past the Arndt residence. From the cruiser, Officer Skanes saw a male standing in the shadows near a

first-story window of the Arndt house, an unidentified individual who was holding a rectangular box, which the officer believed was either a "VCR or a stereo piece of equipment . . . as if to be tugging on it and attempting to pull it down from the window." According to Officer Sherman, the individual "jumped back into the window, tugged on the cord once again, and came back down to the ground, and tried to tug again at the stereo," because the stereo's cord was still attached inside the house or somehow snagged in the window frame.

After turning the cruiser around in front of the Arndt house, Officer Skanes activated the cruiser's spotlight, which illuminated the area near the window and displayed the individual in its beam. Officer Skanes stopped the cruiser, got out, and ordered the individual to "stop and halt." By the cruiser's light and from some undisclosed previous encounter, the officers recognized the individual as Robert Watkins, who, having placed the stereo on the ground, at first walked and then ran behind the Arndt residence, with Officer Sherman in pursuit. When Watkins reappeared at the front of Arndt's residence and was running toward a house across the street, Officer Skanes shouted "Robert," and ordered the fleeing man to stop. Watkins complied. During a pat-down search of Watkins, Officer Skanes noticed a set of keys in the right front pocket of Watkins' pants. After Watkins was arrested, he was handcuffed by Officer Skanes and placed on the cruiser's rear seat. Officer Sherman later saw a set of keys on the cruiser's floor near Watkins' location on the rear seat.

Officer Skanes, accompanied by Officer Sherman, returned to the Arndt residence to ascertain whether anyone was inside the house, although the officers had not observed anyone but Watkins in the vicinity of the Arndt residence. Officer Skanes entered the Arndt house through the open living room window, at which the officers had first observed Watkins, and found the dwelling's interior to be "ransacked or in disarray." Crime lab technicians were called. Watkins was transported to police headquarters and booked on a charge of burglary.

During his case in chief, Watkins testified that he and Dwayne Black, a friend of some 4 years, spent the better part of July 4 drinking gin, vodka, and beer at Black's residence,

directly across from the Arndt house. Watkins observed the Arndt family leave for the fireworks display. Around 10:30 p.m., Watkins noticed a man walking down the sidewalk near Arndt's home. Watkins knew Arndt and realized that the man on the sidewalk was not Arndt. As Watkins watched, the man went to the living room window on the north side of Arndt's house, pushed the window air conditioner into the house, and entered through the open window. Watkins became suspicious and suggested to Black that they investigate, but Black, who "didn't want to get involved," declined Watkins' suggested investigation and went into his house, which had no telephone, where he watched television.

Watkins crossed the street to the Arndt house and, on arriving at the open window, shouted to the man inside: "Hey, you better come on out of there." As the intruder was climbing through the open window, the stereo was knocked from the window ledge and dangled by its cord, which apparently had become caught in the window's frame. While the intruder descended from the window, Watkins became alarmed, threw his set of keys at the "burglar," and then requested that the burglar assist Watkins in locating the keys, which Watkins thought might be located somewhere in the dark on the ground beneath the window and the dangling stereo. Before long, the burglar suddenly ran away, leaving Watkins groping in the dark for his keys. As Watkins manually moved the dangling stereo in his effort to find his keys, the police cruiser arrived and illuminated the window area. As expressed by Watkins, "When they shined the lights on me, that's when I said, 'I'm getting out of Dodge.' " Watkins ran behind the house, and at trial explained: "If they wouldn't have shined the light on me, I would have stayed. But when they shined the light on me, they was going to accuse me of it anyhow. . . . Breaking in the house."

Dwayne Black, also a witness during Watkins' case, testified that he had observed the pedestrian stranger near the Arndt house, as recounted by Watkins. After Black went inside his house and Watkins went to the Arndt residence to investigate, Black never saw Watkins during the remainder of July 4. With the exception of his observing the stranger, Black denied any

knowledge about the break-in at Arndt's, although shortly before midnight Black learned that Watkins had been arrested. On cross-examination and over Watkins' objection, the prosecutor asked Black:

> Q. . . . Isn't it true that when you spoke with Mr. Arndt and with Mr. Pottebaum on July 8th of 1986, four days after the time of the burglary of Mr. Arndt's house, didn't you tell them that you had information from a relative of yours that [Watkins], in fact, had committed the crime of burglary?

Black denied making such statement to Arndt. As the State's rebuttal witness, over Watkins' objection, Norman Terry Arndt testified that, 4 days after the burglary of his home, Arndt and Black were talking about the burglary. During that conversation, Black stated to Arndt that Black's brother-in-law had told Black that " 'Bobby did it.' . . . [H]is brother-in-law told him [Black] he had seen him [Watkins] do it all."

Although Watkins had moved for a directed verdict of acquittal on account of insufficiency of evidence against him, the court overruled Watkins' motion and submitted the case to the jury, which found Watkins guilty of the crime of burglary.

MOTION: DIRECTED VERDICT OR DISMISSAL

Section 28-507 defines the crime of burglary: "A person commits burglary if such person willfully, maliciously, and forcibly breaks and enters any real estate or any improvements erected thereon with intent to commit any felony or with intent to steal property of any value."

Watkins' motion for a directed verdict of acquittal or dismissal of the charge against him was properly overruled.

> In a criminal case a court can direct a verdict only when (1) there is a complete failure of evidence to establish an essential element of the crime charged, or (2) evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained.

State v. Clancy, 224 Neb. 492, 501, 398 N.W.2d 710, 717 (1987). See, also, State v. Brown, 225 Neb. 418, 405 N.W.2d 600 (1987).

On a defendant's motion to dismiss for insufficient evidence of the crime charged against such defendant, the State is

entitled to have all its relevant evidence accepted or treated as true, every controverted fact as favorably resolved for the State, and every beneficial inference reasonably deducible from the evidence. Cf. *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 412 N.W.2d 56 (1987).

Without repeating the facts, there is relevant evidence from the officers and Watkins which establishes each of the elements of burglary, § 28-507, namely, that Watkins willfully, maliciously, and forcibly broke and entered the Arndt house and had the intent to steal property located inside that dwelling.

## IMPEACHMENT BY PRIOR INCONSISTENT STATEMENT

Next is the question concerning admissibility of Black's prior inconsistent statement made to Arndt regarding Watkins' involvement in the burglary.

In its distilled substance, the prosecutor's question to Black was: Did you tell Arndt that your relative informed (told) you that Watkins had committed the burglary?

In the setting of Watkins' appeal, we are not confronted by a party's questionable conduct in calling a witness to impeach that witness and thereby present otherwise inadmissible evidence, such as hearsay, to the jury, which might miss the subtle distinction between impeachment and substantive evidence. See *State v. Marco*, 220 Neb. 96, 368 N.W.2d 470 (1985). As expressed in *State v. Jackson*, 217 Neb. 363, 367, 348 N.W.2d 876, 878 (1984): "[T]he State may not use a prior inconsistent statement of a witness under the guise of impeachment for the primary purpose of placing before the jury substantive evidence which is not otherwise admissible." See, also, *State v. Brehmer*, 211 Neb. 29, 317 N.W.2d 885 (1982).

In this appeal, we find attempted impeachment through use of a prior inconsistent statement made by a witness called by the adverse party.

"The credibility of a witness may be attacked by any party, including the party calling him." Neb. Evid. R. 607 (Neb. Rev. Stat. § 27-607 (Reissue 1985)).

Regarding a witness' prior inconsistent statement, "Extrinsic evidence of a prior inconsistent statement by a witness is not

admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require." Neb. Evid. R. 613(2) (Neb. Rev. Stat. § 27-613(2) (Reissue 1985)).

The State contends that Black's statement to Arndt was admissible as a prior inconsistent statement because Black denied making the statement in question.

However, Neb. Evid. R. 607, which authorizes impeachment, and Neb. Evid. R. 613, which permits extrinsic evidence of a prior inconsistent statement to impeach a witness, are not absolute rules for testimonial impeachment of a witness.

Permissibility of testimonial impeachment by use of a witness' prior inconsistent statement is determined by collaterality of the prior statement, or, as this court expressed in *O'Connor v. State*, 123 Neb. 471, 475, 243 N.W. 650, 652 (1932):

> The principle is stated in *Attorney General v. Hitchcock*, 1 Wels. H. & G. Exch. (Eng.) 91: "The test, whether the matter is collateral or not, is this: If the answer of a witness is a matter which you would be allowed on your part to prove in evidence—if it have such connection with the issue that you would be allowed to give it in evidence—then it is a matter on which you may contradict him."

Referring to the test found in *The Attorney-General v. Hitchcock*, 154 Eng. Rep. 38 (Exch. 1847), Wigmore states: "The simple test is . . . whether [the contradictory statement] concerns 'a matter which you would be allowed on your part to prove in evidence' independently of the self-contradiction,— i.e., if the witness had said nothing on the subject." 3A J. Wigmore, Evidence in Trials at Common Law § 1020 at 1011 (J. Chadbourn rev. 1970).

The prohibition against impeachment concerning a "collateral" fact or matter was reaffirmed in *State v. Tainter*, 218 Neb. 855, 857-59, 359 N.W.2d 795, 797-98 (1984):

> The applicable rules were stated in *State v. Zobel*, 192 Neb. 480, 484, 222 N.W.2d 570, 572-73 (1974):
> ". . . If a witness is cross-examined on a matter

collateral to the issues, his answer cannot be subsequently contradicted by the party conducting the examination. [Citation omitted.] . . ."

In *State v. Claire*, 193 Neb. 341, 344, 227 N.W.2d 15, 18 (1975), we said:

". . . 'Evidence which does not tend to impeach any witness on a material point and which is not substantive proof of any fact relative to the issue is properly excluded.' "

The rule was stated in *Jones v. Tranisi*, 212 Neb. 843, 846, 326 N.W.2d 190, 192 (1982), as follows:

" '[A] witness may not be impeached by producing extrinsic evidence of "collateral" facts to "contradict" the first witness's assertions about those facts.' McCormick on Evidence § 47 at 98 (2d ed. 1972). McCormick further says at 98: 'What is to be regarded here as within this protean word of art, "collateral"? The inquiry is best answered by determining what facts are not within the term, and thus finding the escapes from the prohibition against contradicting upon collateral facts. The classical approach is that facts which would have been independently provable regardless of the contradiction are not "collateral." ' The above is the rule in Nebraska. ' "It is only as to matters relevant to some issue involved in a case that a witness can be contradicted for the purpose of impeachment." Carpenter v. Lingenfelter, 42 Neb. 728, 60 N.W. 1022, 32 L.R.A. 422.

. . . .

' "The general rule is that a witness cannot be impeached as to collateral or immaterial matter brought out on cross-examination; * * *." ' *Ambrozi v. Fry*, 158 Neb. 18, 26, 62 N.W.2d 259, 265 (1954)."

Some believe that the test for admitting or excluding a prior contradictory statement to impeach a witness should be controlled by Neb. Evid. R. 401 (relevant evidence; defined) (Neb. Rev. Stat. § 27-401 (Reissue 1985)), Neb. Evid. R. 402 (admissibility of relevant evidence) (Neb. Rev. Stat. § 27-402 (Reissue 1985)), and the factors prescribed in Neb. Evid. R. 403 (Neb. Rev. Stat. § 27-403 (Reissue 1985)): "Although relevant,

evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

> Applying Rule 403 to impeachment by contradiction would require courts to exclude the proffered impeachment evidence if its probative value was substantially outweighed by these factors. This approach of leaving contradiction testimony to the discretion of the trial judge has been approved by Wigmore and McCormick . . . .

3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 607[05] at 607-79 (1987).

As observed in McCormick:

> The application of the standard theory of collateral contradiction . . . has been criticized for use under the Federal Rules of Evidence on the ground that the result is a mechanically applied doctrine without consideration of properly pertinent matters. . . . Basically, Federal Rules of Evidence 401-403, which do govern impeachment by contradiction, are entirely consistent with the "collateral" doctrine . . . except that Rule 403 is explicit in the discretion granted the trial judge to admit or exclude contradictions found relevant under Rule 401.

McCormick on Evidence § 47 at 112-13 (E. Cleary 3d ed. 1984).

We note that Rules 401 to 403 of the Federal Rules of Evidence are substantially identical to Neb. Evid. R. 401 to 403.

Nevertheless, we find Nebraska's current test concerning impeachment, that is, impermissible impeachment on a fact or matter which is "collateral," is satisfactory for disposition of Watkins' contention that Black's prior contradictory statement was inadmissible. Did Black's prior statement involve a matter which the State could show, independent of Black's self-contradiction? Bearing in mind the crime charged against Watkins was burglary, we must answer the immediately preceding question "No." First, the fact that Black discussed the burglary with his brother-in-law is irrelevant evidence that Watkins burglarized or broke and entered the Arndt house.

Second, the content of Black's conversation with his brother-in-law is clearly hearsay, that is, "[A] statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Neb. Evid. R. 801(3) (Neb. Rev. Stat. § 27-801(3) (Reissue 1985)). Consequently, Black's prior inconsistent statement related to a matter which the State could not prove independent of the self-contradiction and was, therefore, a "collateral" matter on which impeachment is not permitted under present Nebraska law. For that reason, the trial court committed error by allowing admission of Black's prior inconsistent statement.

Our next consideration in Watkins' appeal is whether the trial court's erroneously admitting Black's statement into evidence is reversible error. See Neb. Evid. R. 103(1) (Neb. Rev. Stat. § 27-103(1) (Reissue 1985)): "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." See, also, Neb. Rev. Stat. § 29-2308 (Reissue 1985): "No judgment shall be set aside . . . in any criminal case, on the grounds of . . . improper admission or rejection of evidence . . . if the Supreme Court, after an examination of the entire cause, shall consider that no substantial miscarriage of justice has actually occurred."

Harmless error exists in a jury trial of a criminal case when there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence the jury in a verdict adverse to a substantial right of the defendant. See *United States v. McCrady*, 774 F.2d 868 (8th Cir. 1985).

Recognizing the distinction between an error of constitutional dimensions and a procedural error which does not reach constitutional proportions, we held in *State v. Lenz, post* p. 692, 699, 419 N.W.2d 670, 674 (1988): "[E]rror in admitting or excluding evidence in a criminal trial, whether of constitutional magnitude or otherwise, is prejudicial unless it can be said that the error was harmless beyond a reasonable doubt."

In view of all the evidence before the jury in the Watkins case, we conclude that the error in admitting Black's prior inconsistent statement was harmless beyond a reasonable

doubt. Our conclusion is supported by the substantial, even overwhelming, evidence in addition to Black's inadmissible prior statement. See, *State v. Daniels*, 222 Neb. 850, 388 N.W.2d 446 (1986) (in addition to erroneously admitted evidence, other competent evidence supported a conviction); *State v. Price*, 202 Neb. 308, 275 N.W.2d 82 (1979) (other admissible evidence was substantial; error in admitting evidence was inconsequential); *State v. Franklin*, 194 Neb. 630, 234 N.W.2d 610 (1975) (admissible evidence was very strong and practically conclusive). On arrival at the Arndt house, the officers saw Watkins near the open window, which had been shut by the Arndts. The officers found Watkins with Arndt's stereo in his hands. The officers' observations of Watkins are devastating evidence against Watkins. On discovery, Watkins' mercurial departure from "Dodge" was an inculpatory expression which undoubtedly influenced the jury far more than any prior statement by Black. Again, without reiteration of all salient facts, we are convinced, beyond a reasonable doubt, that the trial court's admitting Black's statement into evidence had no material effect upon the jury in arriving at its verdict, namely, Watkins' guilt of the burglary charged. There is no reversible error in the trial which resulted in Watkins' conviction of burglary. The judgment of the district court is affirmed.

AFFIRMED.