# STATE OF NEBRASKA, APPELLEE, V. WILLIAM H. TONEY, APPELLANT.

498 N.W.2d 544

Filed April 9, 1993.    No. S-92-271.

Thomas M. Kenney, Douglas County Public Defender, and Thomas C. Riley for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

Hastings, C.J., Boslaugh, White, Caporale, Shanahan, Fahrnbruch, and Lanphier, JJ.

Shanahan, J.

William H. Toney appeals from his convictions of second degree murder in the death of Darrin Sherrod and use of a firearm to commit that murder. Crucial to Toney's conviction in his trial by jury in the district court for Douglas County was resolution of contradictory eyewitness testimony concerning the shooting which resulted in Sherrod's death.

## I. MOTION IN LIMINE

Before trial, when Toney notified the State that he intended to use Baron Smith's out-of-court statements made to Ben Gray, the State moved to preclude Toney's introduction of Gray's testimony containing Smith's discussion about the Sherrod homicide. In response to the State's motion, Toney offered Gray's deposition. Smith himself was a homicide victim 9 days after Sherrod's death. Gray was a producer for an Omaha television station which covered the aftermath of the Sherrod fatality.

For approximately 7 years before Sherrod's death, Smith and Gray had been acquainted as volunteer workers in the C.W. Boxing Club sponsored by Carl Washington. On the day after Sherrod's death, Gray met Smith at the boxing club. Smith said that he had been on the street where the shooting occurred and further stated that he had "observed what happened" and that "he was a witness to the entire incident . . . . I was a witness there. I was an eyewitness, and I can tell you for a fact that William Toney did not do the shooting." Smith said that someone was attempting to inculpate Toney in the shooting, "to put it on William Toney," but that Smith wanted Gray "to know that William Toney is not the guy that pulled the trigger." In his conversation with Gray, Smith identified the person who shot

Sherrod, but, on the basis of journalistic privilege, Gray declined to divulge that identification. Without disclosing the identity of the person or persons responsible for shooting Sherrod, Gray related that Smith, referring to Toney, stated: "He's not the guy that did it. He's their uncle. He was there, but he didn't do it." Smith had "nothing to gain by telling an untruth to help William Toney." In fact, Smith was not even personally acquainted with Toney. However, Smith said that he was frightened by the prospects of retaliation from those involved in the shooting and that "he would be in too much trouble on the street, if he came forward" with information concerning the person who actually shot Sherrod. Fearing that Smith's well-being might be jeopardized as the result of disclosing information about the Sherrod homicide, Gray discouraged Smith from publicly disclosing what he knew about the shooting. Eight days later, Smith was killed.

Toney sought admission of Gray's testimony regarding Smith's statements to Gray under Neb. Evid. R. 804(2)(e), Neb. Rev. Stat. § 27-804(2)(e) (Reissue 1989), the residual exception to the hearsay rule, which provides that if a declarant is unavailable as a witness,

> [a] statement not specifically covered by any of the foregoing exceptions [to the hearsay rule] but having equivalent circumstantial guarantees of trustworthiness, [may be admitted] if the court determines that (i) the statement is offered as evidence of a material fact, (ii) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts, and (iii) the general purposes of these rules and the interests of justice will best be served by admission of the statement . . . .

The court sustained the State's motion in limine and excluded Gray's testimony containing Smith's statements.

## II. TONEY'S TRIAL

### 1. GENERAL BACKGROUND

Late in the evening of July 29, 1991, a group of three women and six men, ages 16 to 19 years, were gathered on the sidewalk in a residential area of Omaha where they were eating pizza

when 20-year-old Darrin Sherrod, driving a Chevrolet Malibu south on 33d Street, collided with a car parked near the group. The parked car was owned by Terrance Toney, one of the group. Sherrod stopped and got out of his car to inspect the damage. Sherrod's girl friend, who had been following Sherrod, stopped her car about half a block behind Sherrod's Malibu and saw some of those who had been on the sidewalk move toward Sherrod and push him as he stood near his car. While she was backing her car north on 33d Street, the young woman heard several gunshots and then saw Sherrod, blood covered and running toward her car. Noticing Carl Washington in his car parked in front of his residence, the young woman asked for help. Washington called 911, but, when the rescue squad arrived, Sherrod was dead.

The following morning, police took Terrance Toney into custody for questioning at the police station. Early in the questioning, Terrance Toney stated that he was at the scene of the shooting, but he denied having any weapon that evening and further denied being involved in the assault on Sherrod. Terrance Toney also denied that he saw the person who shot Sherrod. Later during interrogation, Terrance Toney told police that he had seen his uncle, William Toney, shoot Sherrod. Terrance Toney's brother, Troy Toney, who had also been brought to the police station for questioning, stated that he was at the scene of the shooting, but he denied seeing the shooting or any handgun at the scene and also denied striking Sherrod. However, after Troy Toney heard Terrance Toney tell police that William Toney had shot Sherrod, Troy Toney concurred in Terrance Toney's version of the shooting.

## 2. THE STATE'S WITNESSES AT TRIAL

Terrance Toney testified that after Sherrod's car collided with his parked car, he, Troy Toney, and their uncle, William Toney, walked to Sherrod, who was standing beside his Malibu. First, Terrance Toney pushed Sherrod backward, and then Troy Toney "punched" Sherrod in the eye. Meanwhile, Terrance Toney noticed a "shiny glare" in William Toney's hand, saw William Toney raise his hand, and heard two shots as William Toney used a "small . . . silver gun" to shoot Sherrod. At that

point, Terrance Toney grabbed a .38-caliber revolver from Troy Toney's "pants pocket" and went behind the Malibu, where he fired five shots into the car's rear window. According to Terrance Toney, Morris "Mo" Williford was not involved in the fracas or shooting. After the shooting, everyone scattered.

Troy Toney testified that he, Terrance Toney, and William Toney approached Sherrod, who was standing beside his car. Terrance Toney pushed Sherrod, and then Troy Toney struck Sherrod. A few seconds later, when William Toney was approximately a car length from Sherrod, Troy Toney saw William Toney's "arm go up" while William Toney was holding "a small shiny .22" which Troy Toney had not seen before that time. Troy Toney heard two shots just before Terrance Toney took the .38-caliber revolver from Troy Toney and shot out the rear window of Sherrod's Malibu. As testified by Troy Toney, Williford was not directly involved in the altercation.

According to the testimony of Morris "Mo" Williford, when Terrance and Troy Toney were scuffling with Sherrod, Williford was approximately a car length from that tussle and was looking away from the scene when the first shot was fired. Some 10 seconds later, Terrance Toney shot the rear window out of Sherrod's car. Williford testified that he had never seen either Terrance or Troy Toney with a "small gun," but about a week before the shooting he had seen a silver or chrome .22-caliber derringer lying in the grass where the group had gathered before Sherrod's Malibu collided with Terrance Toney's parked car. However, on the night of the shooting, Williford did not see a .22-caliber derringer.

A witness for the State, Jesse McGhee, who was one of those gathered on the sidewalk before the collision, testified that he did not see William Toney with "a weapon" that evening, but had seen Terrance and Troy Toney with "a small two-shot derringer" sometime before the night when Sherrod was shot.

A pathologist testified that the autopsy he performed on Sherrod's body revealed no bruises or marks on Sherrod's head or face. However, he found two gunshot wounds, one in Sherrod's left chest which caused Sherrod to bleed to death, and another gunshot wound in Sherrod's left forearm which was marked by stippling or powder burns, indicating that the

muzzle of the firearm was 6 to 8 inches from Sherrod's arm when the gun was discharged. Two .22-caliber bullets were extracted from Sherrod's body. Police never recovered a .22-caliber firearm in connection with the Sherrod shooting.

### 3. DEFENSE WITNESSES

Latonya Johnson, one of the women in the group which had congregated on the sidewalk, testified that Mo Williford was at Sherrod's car when Troy Toney struck Sherrod. Williford had a "little silver gun" which he pointed at Sherrod. This was the same gun which Terrance Toney had previously attempted to sell to Johnson's girl friend, Melissa Jones. As Sherrod tried to run away, Johnson saw Williford "start shooting a gun" which he had been pointing at Sherrod. Terrance Toney had a larger gun which he also pointed at Sherrod. At the time of the shooting, William Toney was "on his way down by the cars" parked ahead of Sherrod's Malibu. On cross-examination of Latonya Johnson, the State injected the possibility that she was biased and slanted her testimony because she was the sister of Tanika Johnson, the girl friend of William Toney, the defendant.

Melissa Jones, who was also one of the group on the sidewalk, testified that Terrance Toney pulled Sherrod out of his car and that both Troy Toney and Williford struck Sherrod. As Sherrod tried to run away, Williford started shooting at him. When the shooting started, William Toney was approaching Sherrod's car. Jones corroborated Latonya Johnson's testimony that Terrance Toney had tried to sell Jones "a small gun" earlier in the day, before Sherrod was shot. During cross-examination, Jones admitted that she had been previously convicted of giving false information to police.

Tanika Johnson, another in the group, also testified that Terrance and Troy Toney hit Sherrod and that Terrance Toney had a gun and shot toward Sherrod. William Toney was nearing Sherrod's car when the shots were fired. In cross-examining Tanika Johnson, the prosecutor raised the possibility that Tanika was William Toney's girl friend or at least more than a casual acquaintance of William Toney's, since Tanika had written to William Toney in jail while he awaited trial for the

Sherrod homicide.

Carl Washington, who lived near the scene of the shooting, testified that while he was getting into his car parked in front of his house, he saw Sherrod run down the street and then sit down on the curb. When he discovered that Sherrod was bleeding, Washington returned to his house and phoned for assistance. Later in the evening, after the Sherrod shooting, Baron Smith, a friend of Washington's, was at Washington's house and told him that he, Smith, was at the scene and saw the shooting take place. According to Washington, Smith said that he heard "Fat Mo" say, "Bust a cap in the fool," and saw "Mo shoot Sherrod." On cross-examination, the State attempted to discredit Washington by showing that Washington had told police that he had no information about the shooting or Sherrod's assailant. Washington countered that he was trying to shield Smith because Smith had some unpaid traffic fines and was afraid of being arrested. Washington testified that Smith died 9 days after Sherrod's death.

#### 4. VERDICT

Shortly after noon on January 22, 1992, the case was submitted to the jury, which returned a "guilty" verdict at 3 p.m. the next day.

### III. ASSIGNMENTS OF ERROR

Among his assignments of error, William Toney contends that Baron Smith's out-of-court statements to Ben Gray were admissible under Rule 804(2)(e) and that, therefore, the district court erred by sustaining the State's motion in limine and excluding Gray's testimony that contained statements by Smith, an unavailable witness, which exculpated Toney from involvement in Sherrod's death.

### IV. STANDARD OF REVIEW

"[I]n all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by the Nebraska Evidence Rules, not judicial discretion, except in those instances under the Nebraska Evidence Rules when judicial discretion is a factor involved in admissibility of evidence." *State v. Messersmith*, 238 Neb. 924, 936, 473 N.W.2d 83, 92

(1991). See, also, *State v. Thomas*, 240 Neb. 545, 483 N.W.2d 527 (1992). "In a jury trial of a criminal case, whether an error in admitting or excluding evidence reaches a constitutional dimension or not, an erroneous evidential ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt." *State v. Cox*, 231 Neb. 495, 504, 437 N.W.2d 134, 140 (1989). Accord, *State v. Salamon*, 241 Neb. 878, 491 N.W.2d 690 (1992); *State v. Coleman*, 239 Neb. 800, 478 N.W.2d 349 (1992); *State v. Messersmith, supra*. See *State v. Watkins*, 227 Neb. 677, 419 N.W.2d 660 (1988).

## V. RESIDUAL EXCEPTION TO THE HEARSAY RULE

### 1. FACTORS FOR ADMISSIBILITY

In determining whether a statement is admissible under Rule 804(2)(e), the residual exception to the hearsay rule, a court considers five factors: a statement's trustworthiness, materiality of the statement, probative importance of the statement, interests of justice, and whether notice of the statement's prospective use as evidence was given to an opponent. See *Huff v. White Motor Corp.*, 609 F.2d 286 (7th Cir. 1979). See, also, *United States v. Cree*, 778 F.2d 474 (8th Cir. 1985).

Although the State argues on appeal that Toney failed to give notice of his intended evidential use of Smith's statements to Gray, we recall that admissibility of Smith's statements was challenged by the State's motion in limine which expressly referred to Rule 804(2)(e). That motion was filed in response to Toney's notice concerning prospective introduction of Smith's statements as evidence. The notice requirement of Rule 804(2)(e) states:

> A statement may not be admitted under this exception unless the proponent of it makes known to the adverse party, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it . . . .

Under the circumstances, lack of notice is not an issue in this

appeal.

Even when a trial court has considered the foregoing factors in determining whether a statement is admissible under Rule 804(2)(e), an appellate court, reviewing admissibility under the residual exception to the hearsay rule, must reverse the trial court's ruling if the appellate court arrives at " 'a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached based upon a weighing of the relevant factors,' " and that the error was prejudicial. *Huff v. White Motor Corp.*, 609 F.2d at 291 (quoting *In re Josephson*, 218 F.2d 174 (1st Cir. 1954)). Thus, an appellate court, reviewing a trial court's ruling on admissibility under Rule 804(2)(e), will affirm the trial court's ruling unless the trial court has abused its discretion concerning admissibility.

(a) Trustworthiness

In *State v. Jacob*, 242 Neb. 176, 194, 494 N.W.2d 109, 121 (1993), we held that if requisite notice has been given to an opponent and the evidence is highly probative, the critical issue in determining whether statements are admissible under the residual exception is "whether the circumstances surrounding the making of the hearsay statements by [a declarant] provided the guarantees of trustworthiness comparable to the other hearsay exceptions in the Nebraska Evidence Rules." As we held in *Jacob*, under Rule 804(2)(e), a court must make a preliminary inquiry (Neb. Evid. R. 104) to determine whether a declarant had personal knowledge (Neb. Evid. R. 602) regarding the subject matter of the statement that is sought to be introduced pursuant to the residual exception to the hearsay rule. Furthermore, in determining admissibility under Rule 804(2)(e), a court must examine the circumstances surrounding the declaration in issue and may compare the declaration to the closest hearsay exception as well as consider a variety of factors affecting trustworthiness of a statement, such as the nature of a statement, that is, whether the statement is oral or written; whether a declarant had a motive to speak truthfully or untruthfully, which may involve an examination of the declarant's partiality and the relationship between the declarant and the witness; whether the statement was made under oath;

whether the statement was spontaneous or in response to a leading question or questions; whether a declarant was subject to cross-examination when the statement was made; and whether a declarant has subsequently reaffirmed or recanted the statement. See *State v. Plant*, 236 Neb. 317, 461 N.W.2d 253 (1990). See, generally, 2 McCormick on Evidence § 324 (John W. Strong, 4th ed. 1992).

In *United States v. Howard*, 774 F.2d 838 (7th Cir. 1985), the trial court, pursuant to the residual hearsay exception (Fed. R. Evid. 804(b)(5)), admitted testimony of an FBI agent regarding certain statements of a declarant who died before trial. In affirming the trial court's ruling of admissibility, the appellate court noted that the declarant had volunteered the information and that he was a seemingly disinterested person who had no apparent motive to lie. Moreover, the declarant had directly observed the incident in question. The incident was not so complex as to raise any question about the declarant's ability to perceive, remember, or recount the incident. Finally, the court noted that the declarant had repeated the statement to a private investigator in the presence of a court reporter.

This court addressed a similar situation in *State v. Beam*, 206 Neb. 248, 292 N.W.2d 302 (1980). In *Beam*, the district court, relying on Rule 804(2)(e), admitted into evidence statements made by a declarant whose later death was the basis of a criminal charge against her husband. The statements were made to the declarant's attorney and to a deputy sheriff. In evaluating the trustworthiness of those statements, the court observed that the declarant's statements to her attorney were "made in the course of a professional consultation for purposes of legal advice and possible litigation. Under such circumstances, it is reasonable to assume that an accurate statement of facts would normally be given." 206 Neb. at 254, 292 N.W.2d at 306. Concerning the declarant's statement to the deputy sheriff, this court noted that the deputy sheriff

> was in the course of performance of his official duties, a disinterested witness, and not acquainted with the decedent at the time he found her in the truck in a church parking lot in the middle of the night. She had been crying. She was upset and emotionally disturbed.

206 Neb. at 254-55, 292 N.W.2d at 306. Thus, the court in *Beam* concluded that the statements had guarantees of trustworthiness and were admissible under the residual exception to the hearsay rule, Rule 804(2)(e).

In the present case, Toney sought the admission of statements made by Baron Smith, an eyewitness to the shooting of Sherrod. Unlike the situation in *State v. Jacob*, where the declarant lacked personal knowledge about the subject matter of her statements, Smith's statements to Gray included the assertion that Smith personally witnessed the Sherrod shooting and saw in detail what had happened. Smith had no motive to speak untruthfully about Toney, who was neither related to Smith nor even one of Smith's acquaintances. Moreover, Smith was unrelated to others who claimed to have witnessed the assault on Sherrod and the shooting and was unrelated to anyone who might have been implicated in the assault or shooting. Therefore, Smith was a disinterested observer who had no reason to lie about the shooting and, consequently, was an ostensibly truthful source of information concerning the events surrounding the Sherrod shooting. Smith voluntarily approached Gray, a television producer and member of the news media. However, Smith expressed fear, which to Gray appeared to be well founded, that Smith would suffer some reprisal for communicating information about the Sherrod shooting. Notwithstanding that fear for his own safety, Smith, without prompting from Gray, disclosed information concerning Toney's innocence in the Sherrod shooting. Such disclosure was made against Smith's interest in his own safety and self-preservation. Thus, Smith's fear of reprisal for disclosure, a fear shared by Gray, lends authenticity to the contents of Smith's statements to Gray. The relative spontaneity of Smith's statements, made to Gray on the day after the shooting, also supplies some reliability for the statements. See *State v. Plant, supra* (spontaneity is an indication of a statement's reliability). Having considered all the circumstances surrounding Smith's statements to Gray, we conclude that Smith's statements had the requisite guarantees of trustworthiness for admissibility under Rule 804(2)(e).

### (b) Materiality

"There are two components to relevant evidence: materiality and probative value. Materiality looks to the relation between the propositions for which the evidence is offered and the issues in the case. If the evidence is offered to help prove a proposition which is not a matter in issue, the evidence is immaterial. What is 'in issue,' that is, within the range of the litigated controversy, is determined mainly by the pleadings, read in the light of the rules of pleading and controlled by the substantive law. . . .

"The second aspect of relevance is probative value, the tendency of evidence to establish the proposition that it is offered to prove. . . ."

*State v. Baltimore*, 236 Neb. 736, 740, 463 N.W.2d 808, 812 (1990) (quoting McCormick on Evidence § 185 (Edward W. Cleary 3d ed. 1984)). Accord, *State v. Salamon*, 241 Neb. 878, 491 N.W.2d 690 (1992); *State v. Coleman*, 239 Neb. 800, 478 N.W.2d 349 (1992); *State v. Messersmith*, 238 Neb. 924, 473 N.W.2d 83 (1991). In Rule 804(2)(e)(i), "[t]he requirement that the statement be offered as evidence of a material fact probably means that not only must the fact the statement is offered to prove be relevant, Rule 401, but that the fact to be proved be of substantial importance in determining the outcome of the litigation." Michael H. Graham, Handbook of Federal Evidence § 803.24 at 946 (3d ed. 1991). See, also, *United States v. Iaconetti*, 406 F. Supp. 554 (1976), *affirmed* 540 F.2d 574 (2d Cir.), *cert. denied* 429 U.S. 1041, 97 S. Ct. 739, 50 L. Ed. 2d 752 (1977), *reh'g denied* 430 U.S. 911, 97 S. Ct. 1186, 51 L. Ed. 2d 589.

In Toney's case, the main issue is whether Toney was guilty of killing Sherrod. Smith's statements were offered for the proposition that Toney was not the person who shot Sherrod. Clearly, Smith's statements, if admitted into evidence, would have been available for the jury during their deliberation whether the State had proved its homicide charge against Toney. For that reason, Smith's statements were material in Toney's case.

### (c) Probative Value: Relative Necessity

As the advisory committee's note to Fed. R. Evid. 804(b) states: "The [residual exception to the hearsay] rule expresses preferences: testimony given on the stand in person is preferred over hearsay, and hearsay, if of the specified quality, is preferred over complete loss of the evidence of the declarant."

Consequently, in addition to a statement's possessing equivalent guarantees of trustworthiness, Rule 804(2)(e)(ii) requires that "the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." However, the expression in Rule 804(2)(e)(ii) that a statement be "more probative . . . than any other evidence" which might be reasonably procured is characterized as a general requirement of necessity rather than a strict requirement that the statement be essential to a proponent's case; for example, see, *United States v. Vretta*, 790 F.2d 651 (7th Cir. 1986), *cert. denied* 479 U.S. 851, 107 S. Ct. 179, 93 L. Ed. 2d 115 (hearsay evidence was the most probative evidence because the hearsay evidence was necessary to complete a pattern of criminal conduct which might not otherwise be clearly established), and *United States v. Boulahanis*, 677 F.2d 586 (7th Cir. 1982), *cert. denied* 459 U.S. 1016, 103 S. Ct. 375, 74 L. Ed. 2d 509 (the residual exception to the hearsay rule does not require that hearsay evidence must be essential to a case, but only that the hearsay evidence be the most probative evidence reasonably available on a material issue).

On one hand, some of Smith's statements to Gray were unduplicated in Carl Washington's testimony. For instance, Smith stated that apparently someone at the shooting was attempting to inculpate William Toney in Sherrod's death and that William Toney was not "the guy that did it. He's their uncle," which might be interpreted that Terrance and Troy Toney were actually culprits in the killing.

On the other hand, because some of Smith's out-of-court statements were introduced into evidence through Washington's testimony, some of Smith's statements sought to be introduced through Gray's testimony might be cumulative. " 'Cumulative evidence' means 'tending to prove the same

point to which other evidence has been offered.' " *State v. Coleman*, 239 Neb. 800, 814, 478 N.W.2d 349, 358 (1992). However, as the court observed in *U.S. v. Shaw*, 824 F.2d 601, 610 (8th Cir. 1987), *cert. denied* 484 U.S. 1068, 108 S. Ct. 1033, 98 L. Ed. 2d 997 (1988): " '[E]ven though the evidence may be somewhat cumulative, it may be important in evaluating other evidence and arriving at the truth so that the "more probative" requirement can not be interpreted with cast iron rigidity.' " (Quoting 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence ¶ 803 (24) [01] (1985).)

On cross-examination of Washington and the three young women, the State laid a foundation to impeach those witnesses by calling into question their veracity and indicating that those defense witnesses were unworthy of belief. For example, the State implied that Washington and Melissa Jones had supplied misinformation or even lied to the police. Regarding Latonya and Tanika Johnson, the prosecutor injected the innuendo that these women were biased in favor of William Toney to the extent that they would distort events surrounding Sherrod's death, or, as some might say euphemistically, the truth would be severely disadvantaged by their testimony. Regarding those defense witnesses who may have been impeached in the jury's eyes, Smith's statements to Gray might rehabilitate those witnesses or corroborate their testimony which the State aimed to discredit. In summary, the fact that other testimony was offered on similar subjects expressed in Smith's statements to Gray did not prevent admissibility of Smith's statements offered under the residual exception to the hearsay rule.

Consequently, Smith's statements to Gray would supply not only credible substantive evidence on the material issue of Toney's guilt, but would also serve to restore or preserve credibility for those witnesses whose veracity was assailed on cross-examination by the State.

### (d) Interests of Justice

As the U.S. Supreme Court stated in *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973): "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend

against the State's accusations." "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Id.* Later, in *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986), the Supreme Court noted that "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' " An essential component of this guarantee

> is an opportunity to be heard. . . . That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence. In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and "survive the crucible of meaningful adversarial testing."

476 U.S. at 690-91. Therefore, "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Chambers v. Mississippi*, 410 U.S. at 302.

In *Huff v. White Motor Corp.*, 609 F.2d 286, 295 (7th Cir. 1979), a product liability case, the court stated that "[a]dmission of the evidence will best serve the interests of justice by increasing the likelihood that the jury will ascertain the truth about the cause of the accident." The interests of justice are no less served in a criminal case wherein a defendant must be accorded the opportunity to present an adequate defense to rebut the State's evidence that tends to prove the defendant's guilt for the crime charged. Thus, "the interests of justice always will be served in admitting reliable, relevant hearsay evidence within the confines of the evidentiary boundaries in our ever never ending search for the truth." *United States v. Vretta*, 790 F.2d 651, 660 (7th Cir. 1986), *cert. denied* 479 U.S. 851, 107 S. Ct. 179, 93 L. Ed. 2d 115.

We note that Toney's case was submitted to the jury shortly after noon on January 22, 1992, and that the verdict was returned at 3 p.m. the next day. From the time involved in the jury's deliberation, we can reasonably conclude that the State's case against Toney was not viewed by the jury as overwhelming

or open-and-shut. Although we do not know exactly what went through the collective mind of the jury in Toney's case, the time consumed in deliberation may well indicate extensive effort by the jury in its resolution of the contradictory testimony from those who witnessed events surrounding the fatal shooting of Sherrod. Perhaps Smith's statements to Gray, if received in evidence, would have been considered by the jury and would have affected its verdict to the point of an acquittal. Although we cannot state with certainty that admission of Smith's statements to Gray would have resulted in Toney's acquittal, we are able to conclude that Smith's statements exhibited the guarantees of trustworthiness and were shown to be material and generally necessary for Toney's defense. Under the circumstances, the interests of justice as well as Toney's constitutionally guaranteed right to a fair trial as an aspect of due process lead us to the conclusion that the trial court abused its discretion in ruling that Smith's statements to Gray were inadmissible.

## VI. CONCLUSION

Baron Smith's hearsay statements to Ben Gray met all the requirements for admissibility under Rule 804(2)(e), the residual exception to the hearsay rule, and, thus, should have been admitted into evidence. For that reason, exclusion of Smith's statements was an abuse of discretion. Because the State has not demonstrated that exclusion of the statements was harmless error, exclusion of Smith's statements is reversible error. See *State v. Cox*, 231 Neb. 495, 437 N.W.2d 134 (1989). In light of our disposition of Toney's appeal, it is unnecessary to discuss Toney's assigned errors regarding the prosecutor's allegedly unconstitutional use of peremptory challenges to remove certain jurors from the panel and the trial court's instruction on reasonable doubt. We, therefore, reverse the trial court's judgments entered on the verdicts in Toney's case and remand this cause for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.