STATE OF NEBRASKA, APPELLEE, V. FRANK TLAMKA, APPELLANT.

508 N.W.2d 846

Filed December 10, 1993.   No. S-91-664.

Bradley J. Montag, of Moyer, Moyer, Egley, Fullner & Warnemunde, for appellant.

Don Stenberg, Attorney General, and Delores Coe-Barbee for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, FAHRNBRUCH, and LANPHIER, JJ., and MORAN, D.J., Retired.

MORAN, D.J., Retired.

Frank Tlamka was convicted in a jury trial of first degree sexual assault on a child and sentenced to prison for not less than 2 nor more than 5 years. Tlamka appealed to the Nebraska Court of Appeals, which affirmed the conviction. *State v. Tlamka*, 3 NCA 28 (1993). We granted Tlamka's petition for further review to consider the admissibility of the victim's statements made to an investigating officer 3 days after the assault.

The assault occurred in Lincoln at the home of the victim, J.H., on Sunday afternoon, July 22, 1990, while Tlamka was babysitting J.H. and her younger sister. At the time, Tlamka was 61 years old and J.H. was nearly 5 years old. That day, the victim's grandmother, Arlene, and the victim's mother went shopping and the victim's father worked his part-time job.

Tlamka knew J.H.'s family well because he lived with Arlene and often saw J.H. and her family during their visits to Tlamka and Arlene's home in Morse Bluff, Nebraska, and during Tlamka and Arlene's visits to J.H.'s home in Lincoln. Tlamka had a good relationship with Arlene's sons and J.H.'s family. Tlamka often babysat J.H. and her younger sister. Witnesses described J.H. and Tlamka as "very friendly, very close," and

"inseparable." Tlamka regarded the victim as a natural granddaughter, giving her gifts and spending time with her when they were together. J.H. referred to him as "Po-po."

After J.H.'s parents returned home that day, at approximately 5:30 p.m., Tlamka took J.H.'s father aside to talk with him. Tlamka told the father that the parents should keep their bedroom door closed "when [they] were making love because [J.H.] is starting to talk about what [the parents] were doing in there." Tlamka also told J.H.'s father that J.H. had told Tlamka she " 'saw mommy putting daddy's weiner in her mouth.' " After Tlamka and Arlene left J.H.'s home to return to Morse Bluff, J.H's father told J.H.'s mother what Tlamka had said. The father testified that J.H. unexpectedly came "around the corner and she told me, 'I saw Po-po's weiner.' " When questioned by her parents, J.H. indicated by pointing her finger that Tlamka's penis had been placed in her mouth.

The next day, J.H. came to her mother with a naked "Ken doll" and told her mother, " 'This is what Po-po looked like when you were shopping, mama.' " According to her mother, J.H. had never reported similar sexual contact prior to July 22 and never identified anyone other than "Po-po" as being responsible.

After discussing the matter with their pastor, the parents decided to seek police assistance. On the evening of July 25, Mark Lantis, a sergeant of the Lincoln Police Department, visited J.H.'s home, bringing with him anatomically illustrative dolls.

When Officer Lantis arrived, he observed J.H. running about her home. On cross-examination, he was asked about J.H.'s demeanor the evening he interviewed her. Officer Lantis testified that J.H. was "overly shy when I first got there, however . . . after I'd been with her for a while she was real — real easygoing and was able to talk to me and seemed real comfortable with me." During the interview, when Officer Lantis would ask a question, J.H. would look to her parents standing in her bedroom doorway to see if it was okay to answer. Officer Lantis acknowledged on cross-examination that he would expect a 4-year-old girl to be shy.

Over Tlamka's hearsay objection, Officer Lantis testified to

the conversation he had with J.H. The officer stated that he asked J.H. what happened, having her use the dolls to show him what occurred and asking her to use the adult male doll as Tlamka. J.H. related that Tlamka had taken her clothes off. Officer Lantis asked her if Tlamka had kept his clothes on, and J.H. told him, " 'No.' " She proceeded to undress the male doll with the exception of the doll's underwear. Officer Lantis asked J.H., "Is that how he was dressed?" J.H. hesitated and then told the officer, " 'No.' " He asked her to show him how Tlamka was dressed. J.H. then pulled the doll's underwear down until the penis on the doll was exposed.

In response to J.H.'s hesitancy to use the dolls at this point in the interview, Officer Lantis asked her to use the male doll with herself to show him what had happened. J.H. then placed the male doll between her legs, rubbing its penis against her vaginal area and then over her stomach and both her nipples. She then turned over, lay on her stomach, and rubbed the male doll against her buttocks.

In addition to the interview using the dolls, Officer Lantis questioned J.H. further. J.H. told him that vaginal penetration occurred, but not anal penetration, and that Tlamka had placed his penis in her mouth. When questioned whether this had happened anywhere else, J.H. held up two fingers and told Officer Lantis that it had happened when " 'we stayed at grandma's.' "

J.H. was examined by Dr. Kristen Johnson on July 26. J.H. told the doctor that Tlamka had sexual contact with her, and she gave the doctor an account consistent with the one given to the officer. The physical examination indicated no physical evidence of sexual abuse. J.H.'s genital area was normal for a female her age. Her hymen was intact and measured 3 mm, also normal for her age. In an exam the month before, Dr. Johnson had examined J.H.'s genital area, and J.H. did not hesitate to let the doctor do the exam on that occasion. During the exam on July 26, however, the doctor noted that J.H. was hesitant to let the doctor check her genitals closely, that J.H. "kept closing her legs," and that J.H. looked to her mother for reassurance. Despite the lack of physical evidence of sexual abuse, Dr. Johnson was not surprised no physical evidence was found,

considering J.H.'s account.

At trial, J.H. testified and was cross-examined concerning the assault. She testified on direct examination that Tlamka had had sexual contact with her and that at the time his penis was "hard" and pointed downward. On cross-examination, defendant's counsel reminded J.H. of her previous deposition testimony and asked her whether her mother had taught her to say "private," "wee wee," or "rock hard." J.H. answered, "No." J.H.'s testimony was consistent with the reports she gave to Officer Lantis and Dr. Johnson.

In his defense, Tlamka denied having sexual contact with J.H. He testified that on July 22, he was left with J.H. and her sister while Arlene and J.H.'s mother went shopping. After putting J.H.'s sister down for a nap, Tlamka sat down and read the paper. Tlamka related that after a period of time, J.H. told him she was tired and wanted to take a nap. Since J.H. wanted him to come with her to her bedroom, Tlamka accompanied J.H. to her bedroom. Tlamka testified that J.H. lay in her bed for about "three, four minutes" and that J.H. then came to lie next to him on the floor next to her bed. Tlamka stated that after some time, J.H. brushed her hand across his groin, bent over, and "made a kissing sound." Tlamka was surprised and asked J.H. what she was doing. J.H. told Tlamka that she had seen her parents doing what she had done, and Tlamka explained that her parents did that because they were married. According to Tlamka, the conversation ended when Tlamka and J.H heard Arlene and J.H.'s mother return home.

Additionally, Tlamka offered in his defense testimony by Dr. Rodney Taylor, a urologic surgeon from Omaha. Dr. Taylor examined Tlamka, took his medical history, and conducted a nocturnal penial tumescence study in a sleep laboratory to monitor Tlamka's ability to have an erection during sleep. The sleep study revealed that Tlamka had one partial erection, or tumescence, one night and no erection the second night of the study. Normal men Tlamka's age are expected to have four to six adequate erections, adequate being described as sufficient for vaginal penetration, at night during sleep. From his examination and study, Dr. Taylor testified that Tlamka suffered from organic erectile dysfunction, making Tlamka

incapable of having an erection and impotent. Tlamka's medical history disclosed that he had been impotent, that is, unable to have an erection adequate for vaginal penetration, for 10 years.

Dr. Taylor further testified that Tlamka could not have had an erection adequate for vaginal penetration on July 22. However, the doctor stated that loss of sensation to the penis or loss of sexual desire would not necessarily occur despite impotence. In Dr. Taylor's opinion, Tlamka was still capable of achieving orgasm.

In addition to Dr. Taylor's testimony, Tlamka also offered the testimony of his priest, banker, and physician as character witnesses.

The Court of Appeals affirmed Tlamka's conviction, citing *State v. Plant*, 236 Neb. 317, 461 N.W.2d 253 (1990), and other Nebraska decisions for the proposition that the requirements of spontaneity and contemporaneousness for the excited utterance exception to the hearsay rule are relaxed for child-declarants. The Court of Appeals stated that *Plant* and other Nebraska decisions replaced the spontaneity and contemporaneousness requirements of the excited utterance exception by a test of time and the capacity of the child for fabrication. We granted Tlamka's petition for further review, but limited our review to the admissibility of J.H.'s statement or statements to Officer Lantis.

"[I]n all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by the Nebraska Evidence Rules, not judicial discretion, except in those instances under the Nebraska Evidence Rules when judicial discretion is a factor involved in admissibility of evidence . . . ." *State v. Messersmith*, 238 Neb. 924, 936, 473 N.W.2d 83, 92 (1991). Accord, *State v. Toney*, 243 Neb. 237, 498 N.W.2d 544 (1993); *State v. Jacob*, 242 Neb. 176, 494 N.W.2d 109 (1993). "In a jury trial of a criminal case, whether an error in admitting or excluding evidence reaches a constitutional dimension or not, an erroneous evidential ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt." *State v. Cox*, 231 Neb. 495, 504, 437 N.W.2d 134, 140 (1989). Accord, *State v. Toney,*

*supra*; *State v. Salamon*, 241 Neb. 878, 491 N.W.2d 690 (1992); *State v. Messersmith, supra*. See *State v. Watkins*, 227 Neb. 677, 419 N.W.2d 660 (1988).

"Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted . . . ." Neb. Evid. R. 801(3). Hearsay is not admissible except as provided in the Nebraska Evidence Rules or other rules adopted by statute. See Neb. Evid. R. 802. Granting for the sake of argument that J.H.'s out-of-court statements to Officer Lantis were hearsay, we examine whether the statements were admissible under the excited utterance exception to the hearsay rule.

"A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition," although hearsay, is admissible under the "excited utterance" exception to the hearsay rule. Neb. Evid. R. 803(1).

> "For a statement to qualify as an excited utterance, the following criteria must be established: (1) There must have been a startling event, (2) the statement must relate to the event, and (3) the statement must have been made by the declarant while under the stress of the event. . . . The key requirement is spontaneity, which 'requires a showing the statements were made without time for conscious reflection.' "

*State v. Smith*, 241 Neb. 311, 316-17, 488 N.W.2d 33, 37 (1992) (quoting *In re Interest of D.P.Y. and J.L.Y.*, 239 Neb. 647, 477 N.W.2d 573 (1991)). See, also, 2 McCormick on Evidence § 272 (John W. Strong ed. 1992).

For hearsay to be admissible under the excited utterance exception, "[s]tatements need not be made contemporaneously with the exciting cause but 'may be subsequent to it, provided there has not been time for the exciting influence to lose its sway and to be dissipated.' " *State v. Jacob*, 242 Neb. at 188, 494 N.W.2d at 118 (quoting 6 John H. Wigmore, Evidence in Trials at Common Law § 1750 (James H. Chadbourn rev. 1976)). "[T]he key requirement is spontaneity, a showing that the statement was made without time for conscious reflection." *State v. Boppre*, 243 Neb. 908, 927, 503 N.W.2d 526, 538

(1993). Accord, *State v. Jacob, supra*; *In re Interest of D.P.Y. and J.L.Y., supra*; *State v. Plant, supra*. However, the time interval between the startling event and the statements in question is not "of itself dispositive of the spontaneity issue." *State v. Boppre*, 243 Neb. at 927, 503 N.W.2d at 538. Accord, *In re Interest of D.P.Y. and J.L.Y., supra*; *State v. Roy*, 214 Neb. 204, 333 N.W.2d 398 (1983). The permissible length of time between the statement and the startling event is determined on the unique facts of each case. *State v. Boppre, supra*; *State v. Jacob, supra*.

Granting that the first two elements of the exception are met, namely, the existence of a startling event and a statement relating to the event, the sole issue is whether J.H.'s statements were made "under the stress of the event."

In the investigative interview at issue here, Officer Lantis spoke with J.H. 3 days after the alleged assault. During that interview, when Officer Lantis arrived, he saw J.H. running about her home. Officer Lantis testified that J.H. behaved in a manner he would expect of any normal 4-year-old girl. While J.H. answered questions in a "somewhat shy" way, looking to her parents for reassurance, as the interview proceeded, Officer Lantis observed that J.H. was "real easygoing" with him, "was able to talk" to him, and "seemed real comfortable with" him.

As stated in *State v. Plant*, 236 Neb. 317, 329, 461 N.W.2d 253, 264 (1990): "While it is not necessary to show that the declarant was visibly excited in order to qualify under the excited utterance exception, [citations omitted], a declarant's nervous state is relevant to the issue of whether the statement was made by the declarant while under the stress of the event." " ' "[T]he true test in spontaneous exclamations is not when the exclamation was made, but whether under all the circumstances of the particular exclamation the speaker may be considered as speaking under the stress of nervous excitement and shock produced by the act in issue . . . ." ' " *State v. Jacob*, 242 Neb. 176, 188, 494 N.W.2d 109, 118 (1993) (quoting 6 Wigmore, *supra*, § 1745).

In *Plant*, we held that the statements a 4-year-old made to a police investigator 2 days after the startling event, which her statements related, were admissible under the excited utterance

exception of rule 803(1). Cindy Plant witnessed her father throw Christopher Bartlett, her 18-month-old stepbrother, at James Bartlett, her 4-year-old stepbrother, and also saw her father throw Christopher on the floor, causing the head injuries from which Christopher later died. After the abuse of the children occurred, Cindy was placed in foster care.

In a taped interview conducted 2 days after the incident, Cindy told the officer what had occurred. The interview was admitted into evidence over the defendant's hearsay objection. The interviewing officer testified that at the time of the interview, Cindy was extremely shy and apprehensive. She "sucked on a finger, clung to her foster mother, and buried her head into her foster mother." *State v. Plant*, 236 Neb. at 330, 461 N.W.2d at 264. Cindy was not very verbal, and the officer spoke to her for 20 minutes before she would respond. This court held that the taped interview was admissible under the excited utterance exception, rule 803(1), further holding that the interview was also admissible under the residual exceptions to the hearsay rule.

*Plant* is distinguishable from the case at bar. Cindy was taken from her parents and placed in the custody of foster parents after she witnessed a brutal incident of child abuse. Here, J.H. remained in the care of her parents from the time of the assault to the time of the interview with Officer Lantis. Where Cindy witnessed an outrageous assault on her siblings, was uprooted from familiar surroundings, and was placed in the custody of caring strangers, J.H. remained in her parents' care, providing her an opportunity to talk with them concerning the assault. While J.H. appeared hesitant to relate the incident to Officer Lantis, he observed nothing out of the ordinary in J.H.'s behavior.

We think, under the unique circumstances of this case, that J.H. did not make her statements to Officer Lantis while under the stress of excitement caused by the assault. While evidence or lack of evidence of a declarant's visible state of excitement is not dispositive, see *State v. Jacob, supra,* and *State v. Plant, supra,* J.H.'s nervous state at the time of the interview on Wednesday evening is certainly relevant to determine whether her statement was made under the stress of what happened to her the previous Sunday afternoon when Tlamka babysat. Given that J.H. had

the opportunity to talk with her parents about what had happened to her and that approximately 72 hours had passed, there was time for conscious reflection on what occurred. Because she seemed to behave as normally as any other 4-year-old girl, J.H. did not make her statements under the stress of the event. Therefore, the requirements of rule 803(1) are not met, and the statements were inadmissible under the excited utterance exception.

It is true that in *Plant* and other Nebraska decisions cited in *Plant*, we "loosened the spontaneity requirement" of the excited utterance exception and acknowledged that for cases involving young children, our inquiry considers a child's lack of capacity to fabricate rather than lack of time to fabricate. However, in *Plant*, we also considered the nervous state the child-declarant was in when the out-of-court statements were made. We think the declarant's nervous state at the time the statement is made, no matter what the declarant's age, is relevant and should be considered in determining the admissibility under rule 803(1). While visible signs of emotional upset are only one factor to consider, the absence of such visible signs weighs against admitting the statements under rule 803(1). See *In re Interest of R.A. and V.A.*, 225 Neb. 157, 403 N.W.2d 357 (1987), *overruled on other grounds, State v. Jacob*, 242 Neb. 176, 494 N.W.2d 109 (1993).

Under the circumstances here, the statements were not made under the stress of the event, and, therefore, J.H.'s statements made to the officer were inadmissible under the excited utterance exception.

However, J.H.'s statements made to Officer Lantis cannot be properly characterized as hearsay at all because the statements fall within Neb. Evid. R. 801(4)(a)(ii):

A statement is not hearsay if:

(a) The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . (ii) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive . . . .

See, *In re Interest of D.J. et al.*, 224 Neb. 226, 397 N.W.2d 616 (1986); *State v. Johnson*, 220 Neb. 392, 370 N.W.2d 136 (1985); *State v. Packett*, 206 Neb. 548, 294 N.W.2d 605 (1980).

Here, J.H. testified at trial and was subject to cross-examination concerning the statement she made to Officer Lantis. On cross-examination, Tlamka's counsel questioned J.H. concerning statements she had made in a pretrial deposition. Tlamka's counsel asked her who had taught her to say "private," "wee wee," and "rock hard," the implication being that someone had coached J.H. in articulating the assault. By this line of questioning, Tlamka's counsel implied that J.H.'s testimony was the product of improper influence. J.H.'s statement on the stand was consistent with what she told Officer Lantis. Therefore, J.H.'s statements to the officer could have been properly admitted under rule 801(4)(a)(ii).

" 'Where the record adequately demonstrates that the decision of a trial court is correct, although such correctness is based on a ground or reason different from that assigned by the trial court, the Supreme Court will affirm.' " *State v. Dixon*, 223 Neb. 316, 322, 389 N.W.2d 307, 311 (1986). "If in fact the ruling was correct there could not have been any prejudice to the defendant. A judgment will not be reversed because a lower court gave an incorrect reason for its decision if the result reached was correct." *State v. Highly*, 195 Neb. 498, 500, 238 N.W.2d 909, 911 (1976). Accord *State v. Morrow*, 237 Neb. 653, 467 N.W.2d 63 (1991). Because the trial court could have properly admitted J.H.'s statements to Officer Lantis under rule 801(4)(a)(ii), we find no prejudice to Tlamka and, therefore, affirm the judgment of the Court of Appeals which affirmed Tlamka's conviction of first degree sexual assault on a child.

AFFIRMED.